McINTYRE *et al. v.* HARRISON, Comptroller-general, *et al.*

66

No. 7887.  FEBRUARY 10, 1931.  REHEARING DENIED FEBRUARY 28, 1931.

*J. Ira Harrelson,* for plaintiffs.

*George M. Napier, attorney-general, T. R. Gress, assistant attorney-general, Robert B. Troutman, Robert S. Sams, S. J. Smith, Jr., T. M. Cunningham,* and *Little, Powell, Reid & Goldstein,* for defendants.

HINES, J. The plaintiffs seek to enjoin the Comptroller-general from collecting from them the tax imposed by section 31 of the act of August 29, 1929, which amended the general tax act of 1927, upon the ground that they do not fall within the provisions of said section, for the reason that they have not been granted a certificate of public convenience and necessity, permitting them to engage in the transportation of passengers or freight, or both, between fixed termini; and they further seek to enjoin the Georgia Public Service Commission from enforcing against them the provisions of the motor-carrier act of 1929, upon the ground that said act applies only to common carriers and not to private carriers, within which latter class they fall; and upon the further ground that if said act is held applicable to private carriers, it is unconstitutional and void, because it violates the due-process clauses of the State and Federal constitutions; and article 1, section 3, paragraph 1, of the constitution of this State, which declares. that "Private property shall not be taken or damaged for public purposes, without just and adequate compensation being first paid;" and article 1, section 3, paragraph 2, which provides that "No . . retroactive law, or law impairing the obligation of contracts, . . shall be passed;" and article 1, section 10, paragraph 1, of the Federal constitution, which declares that "No State . . shall pass any . . law impairing the obligation of contracts."

We are met at the outset by the proposition, urged by the defendants, that the injunction prayed for by the plaintiffs was properly denied, for the reason that it does not appear that there has been any interference with the personal or property rights of the plaintiffs. Has a court of equity the power to enjoin the Public Service Commission from attempting to regulate and control the business of a class of carriers over which it has not been given the specific power of regulation and control, unless the parties complaining can show interference with their personal or property rights, other than the attempt of the commission to regulate and control the business of such class, and the threats to prosecute the plaintiffs, their agents and servants, for failure to comply with the provisions of this act? The commission undertook to regulate common carriers by motor-vehicles who were engaged in the business of carrying passengers and goods for hire over the public highways of this State, under the law as it existed prior to the passage

of the motor-carrier act of 1929. Certain persons engaged in this business filed their petition to enjoin the commission from exercising jurisdiction over such business, upon the ground that the commission had not been given power to regulate and control the business of common carriers by motor-vehicles. This court sustained this contention, and reversed the judgment of the court below declining to enjoin the commission from exercising this jurisdiction. *Estes* v. *Perry,* 167 *Ga.* 902 (147 S. E. 370). It was not made to appear in any way in that case that the personal or property rights of the complaining plaintiffs were in any way affected or injured otherwise than by the attempt by the commission to exercise jurisdiction over their business. It may be said that the question whether injunction will lie to restrain the commission from undertaking to regulate a business over which the power of regulation had not been conferred on that body was not expressly decided in that case. This power, however, was necessarily assumed in that case.

But, independently of that case, will injunctive relief be granted to restrain the commission from exercising control and regulation over a business, where the power to do so has not been conferred by law upon that body? It is the right of every citizen of the United States to engage in any lawful calling, business, or profession which he may choose, subject only to such restrictions or regulations as are lawfully imposed upon persons engaging therein. The interest, or, as it is sometimes termed, the estate, acquired in such business or profession, that is, the right to continue their prosecution, is often of great value to the possessors, and can not be arbitrarily taken from them any more than their real or personal property can be thus taken; and no control or regulation thereof can be imposed which is not authorized by law. *Riley* v. *Wright,* 151 *Ga.* 609, 613 (107 S. E. 857); Dent *v.* West Virginia, 129 U. S. 114 (9 Sup. Ct. 231, 32 L. ed. 623); Ex Parte Garland, 71 U. S. 333 (18 L. ed. 366); Ex Parte Robinson, 86 U. S. 505 (22 L. ed. 205). Any attempt to deprive a party of such right, which is of the nature of a property right, or to control or regulate the same in any manner not authorized by law, will be enjoined by a court of equity. *Riley* v. *Wright,* supra.

Where the commission actually promulgates rules which they propose and threaten to enforce, the question as to their power under the law and the constitution to do this may be raised and

reviewed by the courts. *Long v. Railroad Commission,* 145 *Ga.* 353, 355 (89 S. E. 328). Equitable jurisdiction exists to restrain criminal prosecutions under unconstitutional enactments, where the prevention of such prosecutions is essential to safeguard the right of property. Tyson &c. Inc. *v.* Banton, 273 U. S. 418 (47 Sup. Ct. 426, 71 L. ed. 718, 58 A. L. R. 1236). Equity will likewise enjoin an unconstitutional enforcement of a constitutional statute. The plaintiffs in this case contend that they are private carriers and not public carriers, and that for this reason they are not subject to the provisions of the motor-carrier act of 1929. If the plaintiffs are private carriers, we shall undertake later in this opinion to show that they are not subject to regulation by the commission under this act. The defendants insist that the plaintiffs, whether they are common carriers or not, operate trucks in which they transport goods over the public roads of the State, and that as such operators of trucks they come under the motor-carrier act of 1929, and are subject to its provisions and to the rules and regulations promulgated by the commission for the enforcement of these provisions. The defendants further contend that the taxes, charges, regulations, and duties imposed by the motor-carrier act of 1929 are applicable to the plaintiffs in this case, as they are carriers of freight for hire over the public highways of this State; and they admit that they are endeavoring to compel intervenors to comply with said statute and pay the taxes, fees, and charges required under said statute. They deny, however, the allegations of plaintiffs that they are endeavoring to compel them to become common carriers, or to be regulated as such. In the 12th paragraph of their petition the plaintiffs allege that the defendants, their agents, officers, and employees have notified and threatened them that if they do not fully comply with the terms of said act and said rules and regulations, and pay the taxes and license charges provided thereby and become common carriers of freight and public utilities, they will be subjected to criminal prosecutions, and their property seized, levied upon, and sold to pay said taxes, fees, and charges. Plaintiffs further allege that the defendants are seeking to have them pay said taxes and charges, and to compel them to submit to said acts and rules and regulations by reason of said threats, or else to give up their businesses and lose their investments therein. The defendants in their answer neither admit nor deny the allega-

tions of this paragraph of the petition and the conclusions therein set up; but they insist that plaintiffs are subject to the motor-carrier act of 1929.

If plaintiffs are private carriers, then they are not subject to the motor-carrier act of 1929, as we shall undertake hereinafter to show; and in that event they would not be liable to control and regulation by the commission under that act. On the contrary, if they are common carriers, as the defendants insist, then they would be subject to control and regulation by the commission under that act; but they would not be subject to that act if they were not common carriers. If the plaintiffs do not come within the provisions of the motor-carrier act by reason of the fact that they are private carriers, then they would be entitled to have the commission enjoined from exercising control and regulation of their business. In that case the attempt of the commission to subject them to its control and regulation would be such an interference with their business and their rights of property as would entitle them to injunctive relief. The operator of automobiles for hire, who is a private carrier suing to enjoin the commission from enforcing orders against him, is without remedy at law, and can enjoin such action on the part of that body. Bell v. Harlan, 20 F. (2d) 271. By parity of reasoning, such private carrier would be entitled to injunctive relief against the commission from undertaking to exercise control and regulation of his business under the motor-carrier act. If the private carrier would be entitled to injunctive relief as against the commission for enforcing regulatory orders against him under this act, he would be equally entitled to such relief to stop the commission from attempting to subject him to the provisions of this act, when it is the declared purpose of the commission to enforce the act and its rules and regulations against such private carrier. Section 15 of this act applies only to proceedings to review final orders of the commission in matters in which the commission has power and authority thereunder to act. It provides only for review of such final orders in matters over which the commission has jurisdiction.

But it is insisted that the majority of this court held to the contrary of what we now hold, in *Bowden* v. *Georgia Public Service Commission,* 170 *Ga.* 505 (153 S. E. 42). The facts of the present case differentiate it from that case. In the present case the

facts show interference with plaintiffs' rights. Besides, in that case the commission had not undertaken to require plaintiffs to comply with any particular provisions of the act. In this case the contrary is true. The defendants admit that they are undertaking and intending to require the plaintiffs to comply with the provisions of the motor-carrier act and with the various rules and regulations promulgated by that body to carry these provisions into effect. They deny that they are endeavoring to compel the plaintiffs to become common carriers, or to regulate them as public utilities; but they allege that the plaintiffs are common carriers. It necessarily follows from the above admission and denial, the former to the effect that the commission is endeavoring to enforce against the plaintiffs the provisions of the motor-carrier act and of their rules adopted to carry the same into effect, and the latter in effect that they are not endeavoring to regulate them as public utilities, that that body is endeavoring to control and regulate them as private carriers or private utilities. As we have seen, the plaintiffs allege that the commission, its agents, officers, and employees have notified them that if they do not fully comply with the terms of said act and the rules and regulations of the commission to carry the same into effect, and pay the taxes and license charges provided thereby, and submit to the control and regulation of that body, and become regulated as common carriers and public utilities, and become common carriers and public utilities, the plaintiffs, their officers, agents, and employees will be subjected to criminal prosecutions, arrests, and fines or imprisonment, and their property seized, levied upon, and sold to pay said taxes, fees, and charges. In their answer to this paragraph of the petition the members of the commission say that they can neither admit nor deny the above allegations, and the conclusions reached therein, but assert that the plaintiffs are subject to the motor-carrier act of 1929. These allegations are peculiarly within the knowledge of the members of the commission; and as they are not denied by them in their answer, they will be taken as true. Civil Code (1910), § 5637. Allegations in reference to a matter peculiarly within the knowledge of the defendants must be expressly denied, or they will be taken as admitted. *Raleigh &c. R. Co.* v. *Pullman Co.,* 122 *Ga.* 700 (50 S. E. 1008). A mere statement that defendants can neither admit nor deny an allegation, without giving the reason therefor, is no answer, and

is an admission under this section. *Southern Bell Telephone &c. Co.* v. *Shamos,* 12 *Ga. App.* 463 (77 S. E. 312) ; *Moore* v. *Calvert Mortgage &c. Co.,* 13 *Ga. App.* 54 (78 S. E. 1097) ; *Horne* v. *Peacock,* 122 *Ga.* 45 (49 S. E. 722). So the allegations of this paragraph of the petition, other than the one that the commission is insisting that they become common carriers of freight, must be taken as true. It thus appears that the commission is undertaking to control and regulate the businesses of the plaintiffs, whether they are common carriers or public utilities or not; and if they are without authority to do so, their attempt to control and regulate the businesses of the plaintiffs is without authority of law and is unlawful.

It can hardly be questioned that if the commission is transcending its authority in this matter, by attempting to enforce against the plaintiffs the provisions of this act and the rules and regulations adopted by it to put the same into effect, and is threatening to subject the plaintiffs, their officers, agents, and employees to the penalties provided by that act, a court of equity will enjoin the commission from so doing as an unwarrantable exercise of its power. The petition in this case is not based upon a mere apprehension that the commission will do the things complained of; and does not fall within the ruling made in *Cathcart Van & Storage Co.* v. *Atlanta,* 169 *Ga.* 791 (151 S. E. 489). The plaintiffs were justified in taking the commission at its word that it would enforce and was attempting to enforce against them the provisions of this act, and its rules and regulations adopted to carry the same into effect. The present action is not a declaratory one, and does not fall within the ruling made in *Southern Railway* v. *State,* 116 *Ga.* 276 (2) (42 S. E. 508). Furthermore, the plaintiffs are seeking to enjoin the comptroller-general from undertaking to collect the tax imposed by section 31 of the act of August 29, 1929, which amended the general tax act of 1927, upon the ground that they are not liable to this tax under the facts of this case. Injunction will lie at the instance of any taxpayer, who has not estopped himself, to enjoin the sale of his property for the collection of an unauthorized tax. *Green* v. *Hutchinson,* 128 *Ga.* 379 (57 S. E. 353) ; *Bibb National Bank* v. *Macon,* 148 *Ga.* 478 (97 S. E. 72) ; *Fulton Trading Co.* v. *Baggett,* 161 *Ga.* 699 (131 S. E. 358). Injunction will lie to enjoin the collection of an unlawful tax under a city

ordinance, the city having caused the arrest of the employee of the taxpayer on a penal charge of violating the ordinance, and threatening to rearrest him for such act of soliciting trade, and also to proceed by the issuing of executions against the employer for the amount of the tax. *City of Albany* v. *Newark Shoe Co.*, 152 *Ga.* 557 (2) (110 S. E. 283). In that case execution had not been issued or levied, but only threatened. In the present case the comptroller-general admits that he intends to issue executions against the various plaintiffs for this tax, and that he will do so if not restrained.

By the great weight of authority, several taxpayers affected in a similar manner by an illegal tax or license fee may join in a proceeding in equity to restrain the enforcement of the tax and for such other relief as the nature of the case presented may require, provided it is common to all of them. *Vanover* v. *Davis,* 27 *Ga.* 354; *Hewin* v. *Atlanta,* 121 *Ga.* 723 (49 S. E. 765, 67 L. R. A. 795, 2 Ann. Cas. 296) ; Fairley *v.* Duluth, 150 Minn. 374, 185 N. W. 390, 32 A. L. R. 1258, 1266, and cit.) Injunction will lie to enjoin the collection of a tax under a statute which does not authorize its imposition, when the proceeding is brought by a number of persons against whom it is sought to enforce the tax, upon the equitable principle of avoidance of a multiplicity of actions. *Vanover* v. *Davis,* supra; *Hewin* v. *Atlanta,* supra; 26 R. C. L. 461, 462 (§ 416) ; Fairley *v.* Duluth, supra; Sherman *v.* Benford, 10 R. I. 559; Carlton *v.* Newman, 77 N. H. 408 (1 Atl. 194). Counsel for the comptroller-general insist that where the question involved is whether certain individuals belong to a class who are taxed, it is a question of fact for decision by the officer in charge of the collection of such tax, and not by the courts. They rely upon *Bohler* v. *Schneider,* 49 *Ga.* 196; and *Decker* v. *McGowan,* 59 *Ga.* 806. These two cases have been modified by the later decisions of this court. In *Southwestern R. Co.* v. *Wright,* 68 *Ga.* 311 (Aff. 116 U. S. 231, 6 Sup. Ct. 375, 29 L. ed. 626), it was held: "Where any ministerial officer of this State is attempting to collect money out of a person, natural or artificial, under the forms of law, but without any valid law to authorize the process he uses and calls an execution for taxes, it is the duty of the courts, in a proper case made, to arrest the proceeding in some of the modes known to the law, and afford relief to the party justly complaining."

The remedy by illegality is purely statutory, and is only available under circumstances provided by law. *State* v. *Sallade,* 111 *Ga.* 702 (36 S. E. 922). This remedy is confined to executions based upon judgments rendered by courts. *Manning* v. *Phillips,* 65 *Ga.* 549. Where no remedy is provided by statute, injunction is the proper remedy. *Goldsmith* v. *Georgia R. Co.,* 62 *Ga.* 485; *City of Atlanta* v. *Jacobs,* 125 *Ga.* 523 (54 S. E. 534). The decisions relied on by counsel were reviewed and modified by this court in *Webb* v. *Newsome,* 138 *Ga.* 342 (75 S. E. 106), in which it was held that an equitable petition for injunction is an available remedy to resist the collection of a tax not authorized by law. This ruling was again followed in *Goolsby* v. *Board of Drainage Comrs.,* 156 *Ga.* 213 (6 *b*) (119 S. E. 644). So we are of the opinion that injunction was the proper remedy to resist the enforcement by the comptroller-general of this tax, especially where such proceeding would prevent a multiplicity of suits. We are likewise of the opinion that injunction was the proper remedy to prevent the commission from undertaking to exercise jurisdiction over the business of the plaintiffs as private carriers, if such they be.

■ Are the plaintiffs liable for the tax imposed by section 31 of the act of August 29, 1929, which amends the general tax act of August 25, 1927, by adding thereto paragraph 114? This paragraph provides "There shall be collected by the comptroller-general from every auto transportation company, association, or individual, as defined hereinafter, to which has been granted a certificate of public convenience and necessity, which it or they are hereby required to obtain from the Public Service Commission of this State, permitting him, it, or them to engage in the transportation of passengers or freight, or both, between fixed termini, an occupation tax on a mileage basis of one quarter (1/4) cent per mile on all buses with a capacity of 10 passengers or less, and a mileage tax of one half (1/2) cent per mile on all buses with a capacity of not more than 20 passengers nor less than 10 passengers, and a mileage tax of three quarters (3/4) cent per mile on all buses with a capacity of more than 20 passengers; and a mileage tax of three quarters (3/4) cent per mile on all trucks with a loaded capacity of less than 5,500 pounds, and a tax of two (2) cents per mile on all trucks with a loaded capacity of 5,500 pounds or more, coming within the terms of this act, for every mile traveled by the motor-

vehicles of such auto transportation company, association, or individual, over the public highways of this State." Ga. Laws 1929, pp. 58, 74. Are the plaintiffs liable to the payment of this tax? The doctrine is general that statutes levying taxes should be construed most strongly against the government and in favor of the citizen. *Ansley* v. *Wilson,* 50 *Ga.* 422; *Johnson* v. *Christie,* 64 *Ga.* 120; *First M. E. Church* v. *Atlanta,* 76 *Ga.* 183; *Adair* v. *Ellis,* 83 *Ga.* 467 (10 S. E. 117); *Stewart* v. *Atlanta Beef Co.,* 93 *Ga.* 12, 19 (18 S. E. 981, 44 Am. St. R. 119). Applying this principle in the construction of the above provision of this act, it seems to be clear that the plaintiffs are not liable to this tax. In the first place, this tax is to be collected by the comptroller-general from "every auto transportation company, association, or individual, . . to which has been granted a certificate of public convenience and necessity." None of these plaintiffs have been granted certificates of public convenience and necessity. Under the express terms of this statute this tax can only be collected from those to whom such certificate has been granted. In the second place, this tax can be collected only from auto transportation companies, associations, or individuals engaged in the transportation of passengers or freight, or both, between fixed termini. Statutes levying taxes on the inhabitants of this State will not be extended by implication. The plaintiffs were not engaged in transporting passengers or freight between fixed termini. These things being so, the plaintiffs are not liable to this tax. State *v.* McLemore, 155 Tenn. 59 (290 S. W. 386).

◼ The plaintiffs contend that the motor-carrier act of 1929 is applicable alone to common carriers; and that as they are private carriers of goods for hire, over some of the public highways of this State, this act does not apply to them, and does not subject them to the supervision and control of the Public Service Commission of this State. So one of the questions for decision is this: Does this act apply to private carriers of goods for hire over the public highways of this State, outside of the incorporate limits of cities and towns therein, or is it applicable alone to common carriers of goods for hire over the public highways of this State? The caption of this statute is in part as follows: "An act to regulate the business of transporting for hire persons and property by motor-vehicles on the public highways of this State; to define motor-

carriers, and to subject them to the jurisdiction and regulatory powers of the Georgia Public Service Commission, also to the laws applicable to common carriers of goods and carriers of passengers; to prohibit the operation of vehicles by motor-carriers unless they obtain a certificate of public necessity and convenience." The second section of this act defines a motor-carrier as follows: "The term 'motor-carrier' means every corporation or person owning, controlling, operating, or managing any motor-propelled vehicle (and the lessees, or receivers, or trustees thereof, appointed by any court whatsoever) used in the business of transporting persons or property for hire over any public highway in this State, and not operated exclusively within the incorporated limits of any city or town." The act makes some exceptions to this definition, to which it is unnecessary to refer for the purposes of this case. The above language of the caption of this act, the above definition of a "motor-carrier," and section 3 of this act are very broad. Standing alone they might be held to embrace both common and private carriers, and to confer upon the Public Service Commission the power to regulate the business of any person engaged in the transportation of persons or property, either or both, for hire by motor-vehicles on any public highway in this State. But other provisions of this statute lead us to the conclusion that it was not intended to embrace private carriers, and that its operation must be confined to common carriers alone. We will now consider some of these provisions.

Section 4 (a) of this act provides that no carrier shall, after the act goes into effect, operate without first obtaining from the Public Service Commission, after a hearing under its provisions, a certificate of public necessity and convenience, pursuant to a finding to the effect that the public interest requires such operation. Clearly this is a requirement which applies to common carriers and not to private carriers. The test whether such a certificate shall be granted is whether or not the applicant therefor is rendering public service, and whether such service is necessary. If the service to be rendered is a private and not a public service, no such certificate should be granted. A private carrier renders no public service, but private service. Abbott *v.* Public Utilities Comm., 48 R. I. 196 (136 Atl. 490) ; Mooney *v.* Tuckerman, 50 R. I. 37 (144 Atl. 891). Such a requirement is exacted of a common carrier, and is

purely incidental to that status. The requirement does not apply to a private carrier as such, but to him only in his imposed statutory character of common carrier. Apart from that signification, so far as he is concerned, it does not exist. Frost &c. Co. v. R. Com. of Cal., 271 U. S. 583 (46 Sup. Ct. 605, 70 L. ed. 1101, 47 A. L. R. 457, 460). A private carrier engaged in transportation by motor-vehicle for certain persons or concerns, under contracts with them, is not subject to such requirement. The object and purpose of granting certificates of public convenience and necessity for the operation of motorbus lines is to subserve the convenience and necessity of the traveling public. Bartonville Bus Line v. Eagle Motor Coach Line, 326 Ill. 200 (157 N. E. 175). Casual service such as heretofore has been rendered under private contract is not the proper subject-matter of a certificate of public convenience and necessity. Lake Shore &c. Co. v. Commission, 115 Ohio St. 311 (154 N. E. 239). Persons hauling freight upon special independent contracts need not obtain certificate of public convenience and necessity. Carlsen v. Cooney, 123 Wash. 441 (212 Pac. 575) ; Davis v. Metcalf, 131 Wash. 141 (229 Pac. 2) ; Spokane Northwest Auto Freight v. Tedrow, 144 Wash. 481 (258 Pac. 31).

Section 5 of this act provides that "No certificate shall be issued or continued in operation unless the holder thereof shall give bond, with adequate security, for the protection, in case of passenger vehicles, of the passengers and baggage carried, and of the public, against injury proximately caused by the negligence of such motor-carrier, its servants or agents, and, in cases of vehicles transporting freight, to secure the owner or person entitled to recover therefor against loss or damage to such freight for which the motor-carrier may be legally liable, and for the protection of the public against injury proximately caused by the negligence of such motor-carrier, its servants or agents." Under the presumption that the legislature intends to keep within its power, a statute which provides for auto transportation companies to furnish insurance or bond to satisfy a recovery for injuries to passengers or damage to property must be construed as applicable to common carriers alone. Bell v. Harlan, 20 F. (2d) 271. Imposing the obligation of furnishing an indemnity bond for damage to the property carried has, so far as a private carrier is concerned, no relation to public safety or order in the use of motor-vehicles upon the highways.

Michigan Pub. Utilities Com. *v.* Duke, 266 U. S. 570 (45 Sup. Ct. 191, 69 L. ed. 445, 36 A. L. R. 1105). Such a requirement is a regulation under the police power, which can only be imposed on a public carrier as distinguished from a private carrier. Smallwood *v.* Jeter, 42 Idaho, 169 (244 Pac. 149).

By section 6 of this act it is made the duty of the commission to prescribe just and reasonable rates, fares, and charges for transportation by motor carriers of passengers, baggage, and property, and for all services rendered by motor carriers in connection therewith. This provision can only be constitutionally required in case of public carriers. It is a power incident to the regulation of public carriers alone. "Unless the business in question is one which is public in character, it is not one which it would be due process of law to regulate to the extent of fixing its rates. And unless in the particular instance the business is being conducted upon a public basis, regulations to that extent of what is still a private affair would be equally improper." "The business must be one in which the public has an interest, and at the same time one in which the proprietor has committed himself to the public." Beale & Wyman on Railroad Rate Regulation, § 189; Humbird *v.* Com., 39 Idaho, 509 (228 Pac. 271) ; Story *v.* Richardson, 186 Cal. 162 (198 Pac. 1057, 18 A. L. R. 750) ; Interstate Commerce Com. *v.* Union Pacific Railroad Co., 222 U. S. 541 (32 Sup. Ct. 108, 56 L. ed. 308). A private carrier can make his own rates and choose his own customers. Edgar Lumber Co. *v.* Cornie, 95 Ark. 449 130 S. W. 452) ; Piedmont Mfg. Co. *v.* Columbia R. Co., 19 S. C. 353; Brown *v.* Adams Express Co., 15 W. Va. 812, 820.

Section 12 of this act empowers the commission to fix and prescribe schedules for motor carriers operated thereunder. Evidently this provision is one which can be applied only to common carriers operating upon fixed routes and between definite termini. It would be practically impossible to prescribe schedules for private carriers. Other provisions of this act show clearly that it was not intended to apply to private carriers. Furthermore, the history of this legislation confirms this construction. As we have seen, the commission undertook, under the act of 1907, to regulate common carriers who were engaged in the transportation of passengers or goods on the public highways of this State by motor-vehicles, and the commission was enjoined from so doing, upon the ground of

lack of authority so to do. *Estes* v. *Perry,* supra. Thereupon the legislature passed the motor-carrier act of 1929. It is a familiar principle of law, that, in the construction of a statute, we must look to the old law, the evil, and remedy. The old law was that the commission was without authority to regulate motor-carriers who were engaged in the transportation of passengers or goods over the highways of this State. The evil was that such common carriers of passengers or goods should be regulated in the interest of the public welfare. To remedy this evil the legislature passed this act for the purpose of putting such common carriers under the jurisdiction and control of the Public Service Commission. So we are of the opinion that the motor-carrier act of 1929 was not intended to confer on the Public Service Commission the power to control and regulate the business of private carriers who are engaged in the transportation of goods or passengers by means of motor-vehicles.

But it is insisted by counsel that the State has, by virtue of its control over its highways, the power to prescribe the conditions upon which persons may prosecute the business of transporting for hire property by motor-propelled vehicles, irrespective of whether such business is transacted by a private carrier or a public carrier. The State can prohibit the owners or operators of motor-vehicles from transporting passengers or property for hire therein over the highways of this State. The conduct of the business of a motor-carrier of passengers or property for hire over the highways of this State is a mere privilege, and not a natural or inherent right of the individual conducting such business. Being a privilege, it can be given or withheld. If the State determines that the use of the highways for private purposes in the usual and ordinary manner shall be preferred over their use by carriers for hire, there is nothing in the constitution of the United States or of this State which prohibits such action. The power to exclude altogether generally implies the lesser power to grant the right to use the public highways upon terms and conditions imposed by the legislature. *Schlesinger* v. *Atlanta,* 161 *Ga.* 148 (129 S. E. 861). As a general rule, the State, having the power to deny a privilege altogether, may grant it upon such conditions, not requiring relinquishment of constitutional rights, as it sees fit to impose. Frost *v.* Railroad Com., supra. While this is true, the legislature can not by its fiat

convert a private carrier into a common carrier. A private carrier can not be converted against his will into a common carrier by legislative enactment. Where a motor-vehicle operator is in fact an existing private carrier, the legislature can not by its edict compel him to become a public or common carrier, so as to subject him to regulations which are applicable alone to common carriers. Producers Trans. Co. v. Railroad Com., 251 U. S. 228 (40 Sup. Ct. 131, 64 L. ed. 239); Charles Wolff Packing Co. v. Court of Industrial Relations, 262 U. S. 522 (43 Sup. Ct. 630, 67 L. ed. 1103, 27 A. L. R. 1280); Michigan Public Utilities Com. v. Duke, supra; Frost v. Railroad Com., supra; Purple Truck Garage Co. v. Campbell, 119 Ore. 484 (250 Pac. 213, 51 A. L. R. 816); Mooney v. Tuckerman, supra; Smallwood v. Jeter, supra; State v. Nelson, 65 Utah, 457 (238 Pac. 237, 42 A. L. R. 849); Hissem v. Guran, 112 Ohio St. 59 (146 N. E. 808); State v. Vaughan, 97 W. Va. 562 (125 S. E. 583); State v. Smith, 31 Ariz. 297 (252 Pac. 1011); 42 C. J. 648. A private carrier would be unconstitutionally deprived of his property without due process of law by the State requiring him to become a public carrier in order to secure a permit to use the public highways for transportation purposes. Frost v. Railroad Com., supra. It would likewise be taking his property for public use without just compensation. Michigan Public Utilities Co. v. Duke, supra; Producers Trans. Co. v. Railroad Com., supra; Charles Wolff Packing Co. v. Court of Industrial Relations, supra.

But it is insisted that the motor-carrier act does not compel a private carrier to become a public carrier. It does not do so in express terms; but if the act is held to be applicable to private carriers, it does so by clear and necessary implication. If a private carrier falls within the provisions of this act, he can not transport by motor-vehicle over the public highways of this State passengers or freight for hire without complying with its terms. Failure to do so would necessarily exclude him from operating upon the public highways of this State. Compliance with the provisions of the act is made a condition with which the auto carrier must comply before he can use the public highways for the transportation of persons or property for hire. It is urged that the act with which we are dealing undertakes to regulate the use of the public highways; and that the legislature can do this without violating the due-process clauses of the Federal or State constitutions.

The trouble with this contention is that this act is not one intended to regulate the use of the public highways by motor-vehicles. On the contrary its caption expressly declares that it is intended "to regulate the business of transporting for hire persons and property by motor-vehicles on the highways of this State." Again, the third section of this act declares that "The commission is hereby vested with power to regulate the business of any person engaged in the transportation of persons or property, either or both, for hire by motor-vehicle over any public highway in this State." So it is clear that the purpose of this act is to regulate the business of transporting persons or property for hire over the public highways of this State; and is not intended to regulate the use of the public highways by auto carriers engaged in the transportation of persons or property for hire over such highways. If this act were made applicable to private carriers, it would amount to the exercise of the power to regulate the use of the public highways, so as, in effect, to compel private carriers to become public carriers. This the legislature can not do. A constitutional power can not be used by way of condition to obtain an unconstitutional result. The State can not use its most characteristic powers to reach unconstitutional results. W. U. T. Co., v. Kansas, 216 U. S. 1 (30 Sup. Ct. 190, 54 L. ed. 355); Pullman Co. v. Kansas, 216 U. S. 56 (30 Sup. Ct. 232, 54 L. ed. 378); Sioux Remedy Co. v. Cope, 235 U. S. 197 (35 Sup. Ct. 57, 59 L. ed. 193); Missouri v. Duncan, 265 U. S. 17 (44 Sup. Ct. 427, 68 L. ed. 881); Frost v. Railroad Commission, supra. So to adopt the construction contended for by counsel for the commission, that is, that this act applies to both private and common carriers, would render it unconstitutional and void, so far as private carriers are concerned. In *Georgia Public Service Commission* v. *Saye & Davis Transfer Co.*, 170 *Ga.* 873 (154 S. E. 439), this court did not hold that private carriers were subject to regulation under the motor-carrier act of 1929. That was the individual view of the Chief Justice as expressed in the opinion written by him; but four of the Justices concurred only in the result reached in that case. This concurrence was based upon the fact that in the opinion of these Justices the carrier was a common carrier, and not a private carrier. Justice Gilbert concurred specially upon the same ground, and upon the further ground that the State had the power to regulate its public high-

ways. The writer specially reserved for future consideration the questions involved in this case; and, as he understood, three of his associates took the same view. So a majority concurred only in the result reached, that is, that the carrier in the case cited was subject to regulation, because it was a common carrier. The question whether the State, under its power to regulate its public highways, could impose conditions which would have the effect of forcing private carriers to become public carriers was not considered in that case, and was not decided by the majority of this court.

■ The commission further contends that the plaintiffs, under the facts disclosed by the record, are common carriers, and for this reason are subject to its control and regulation. In order to pass upon the soundness of this contention, we must determine what are common carriers and what are private carriers. "One who pursues the business constantly or continuously for any period of time, or any distance of transportation, is a common carrier, and as such is bound to use extraordinary diligence. In cases of loss, the presumption of law is against him, and no excuse avails him unless it was occasioned by the act of God or the public enemies of the State." Civil Code (1910), § 2712. A common carrier is one that undertakes to carry, and holds himself out as ready to receive for carriage, goods for hire, which he is accustomed to carry, for all people indifferently, so long as he has room. "The undertaking must be general, and for all people indifferently. The undertaking may be evidenced by the carrier's own notice, or practically by a series of acts, by his own habitual continuance in his line of business. He must thus assume to be the servant of the public; he must undertake for all people." "One of the obligations of a common carrier, as we have seen, is to carry the goods of any person offering to pay his hire. With certain specific limitations, this is the rule. If he refuses to carry, he is liable to be sued, and to respond in damages to the person aggrieved; and this is perhaps the safest test of his character." *Fish* v. *Chapman*, 2 *Ga.* 349, 352 (46 Am. D. 393). Parsons says: "We take a common carrier to be one who offers to carry goods for any person, between certain termini or on a certain route; and he is bound to carry for all who tender to him goods and the price of carriage, and insures those goods against all loss but that arising from the act of God or the public enemy; and has a lien on the goods for the price of carriage. These are es-

sentials; and though any or all of them may certainly be modified, and as we think may be controlled, by express agreement, yet if either of these elements is wanting from the relation of the parties, without any such agreement, then we say the carrier is not a common carrier, either by land or by water." 1 Parsons on Shipping & Admiralty, 245. Whether a person is a common carrier or not depends upon the facts; and where there is a question whether the carrier is a private or common carrier, it is to be determined by the facts relating to, first, whether the business is public business or employment, and whether the service is to be rendered to all indifferently; and second, whether one has held himself out as so engaged, so as to make him liable for a refusal to accept the employment offered. Along these lines may go the question whether the contracts under which the business is accepted are made on the basis of private or public carriage. This last, however, is only a circumstance which may be looked to in arriving at a conclusion on the above two mentioned questions. Campbell v. A. B. C. Storage & Van Co., 187 Mo. App. 565 (174 S. W. 140). The liability of common carriers is upon contracts implied by law. No one can become bound by such contracts unless he has either consented to be bound in that character, or has so acted as to justify the belief that he intends to be so bound. Without actual consent or conduct from which it can be presumed, no one can become liable as a common carrier any more than upon any other character of contract. The law applicable to them is extremely rigorous. It is founded in public policy, and not in abstract justice. Varble v. Bigley, 14 Bush (Ky.), 698 (29 Am. R. 435). The law applicable to common carriers being peculiarly rigorous, it ought not to be extended to persons who have neither expressly assumed that character nor by their conduct and from the nature of the business justified the belief on the part of the public that they intended to assume it. 4 R. C. L. 546; 10 C. J. 41.

A private carrier is one who, without being engaged in the business of carrying as a public employment, undertakes to deliver goods in a particular case for hire or reward. He may carry or not as he deems best. He is but a private individual, and is invested, like other private persons, with the right to make his own contracts. 10 C. J. 38 (§ 4) A. If a carrier does not deal with the public indiscriminately as a matter of routine, but in effect

makes an individual bargain in each case, this course of business tends to show that the service is upon a private basis. Campbell v. A. B. C. Storage & Van Co., supra. The making of separate contracts is considered in determining whether a person is a private or a public carrier, but is not conclusive, since contracts might be made simply to escape the duties of a common carrier by subterfuge. The courts, however, can not assume, in determining the status of a person as a common carrier, that separate contracts for transportation were merely a subterfuge, Weaver v. Public Service Com., 40 Wyo. 462 (278 Pac. 542). An automobile haulage contractor holding himself out as ready to carry goods to any destination, and inviting the patronage of the public generally, but who reserves to himself the right of accepting or rejecting their offers of goods for carriage, being guided in his decision by the attractiveness or otherwise of the particular offer, and not by his ability or inability to carry, having regard to his other engagements, is not a common carrier. Belfast Ropework Co. Ltd. v. Bushell, 1 K. B. 210, 23 Com. Cas. 162, 118 L. T. N. S. 310, 34 Times L. R. 156, 8 B. R. C. 783. The courts do not seem to have been able to establish some simple test by which it can be determined without difficulty whether a man is a common or a private carrier. Some courts hold that the main criterion as to whether one is a common carrier is whether he holds himself out as ready to serve every one of the public alike to the limit of his capacity, and within the sphere of the business carried on by him. Gerhard v. Cattaraugus Tanning Co., 241 N. Y. 413 (150 N. E. 500); Weaver v. Public Service Com., supra. The mere fact that a carrier invites all and sundry persons to employ him does not render him a common carrier, if he reserves the right of accepting or rejecting their offers of goods for carriage, whether his vehicles are full or empty, being guided in his decision by the attractiveness or otherwise of the particular offer, and not by his ability or inability to carry, having regard to his other engagements.

■ The holding that the motor-carrier act of 1929 does not confer upon the commission the power to control and regulate private carriers renders it unnecessary to consider the constitutional attacks upon it if it did in fact embrace private carriers. For this reason we do not pass upon any of the constitutional questions raised, otherwise than is done above.

■ The order of the court below is a general denial of the injunction. It does not appear that the judge put his judgment upon a finding that the plaintiffs were common carriers or upon the theory that the motor-carrier act applied to both common and private carriers alike. In this state of the record, the matter being of grave importance to the plaintiffs, and as we have to reverse the judgment for failure of the court below to enjoin the comptroller-general from enforcing against the plaintiffs the tax imposed by section 31 of the act of August 29, 1929, we are of the opinion that the case should be remanded to the court below for further consideration, in view of the construction which we have placed upon the motor-carrier act, and for a specific finding upon the question whether the court finds that the plaintiffs, under such evidence as may be introduced upon another hearing, are common carriers or not.

*Judgment reversed. Atkinson and Hill, JJ., concur. Beck, P. J., and Gilbert, J., dissent. Russell, C. J., does not participate in the decision.*

GILBERT, J., dissenting. As to the right of petitioners to writ of injunction, it is sufficient to say that under the facts the court did not err in refusing an injunction, for the reason stated in *Bowden* v. *Georgia Public Service Commission,* 170 *Ga.* 505 (supra). Due to the public importance, however, of reaching a decision by this court on the main question here involved, I pass to the merits. The main question is whether the State, through its legislative department, may regulate the business of private carriers for hire by motor-vehicles on the public highways. There is no dispute on the question that the business of common carriers by motor-vehicles may be so regulated. So common carriers are not included in this discussion. Nor is there any question of interstate commerce. It has been decided by the Supreme Court of the United States in Frost &c. Co. *v.* Railroad Commission of California, 271 U. S. 583 (supra), that a State can not constitutionally require a private carrier to become a common carrier; so for present purposes that question need not be considered.

It is insisted that the effect of the motor-carrier act of 1929 is to make it necessary for a private carrier to become a public carrier in order to avail itself of the privilege of transporting persons and goods on the public highways for hire. Or, stated in

another way, it is contended that the motor-vehicle act of 1929 impliedly requires a private carrier to become a public carrier in order to transport by motor-vehicle for hire. If that construction of the act is required, then it follows that the act, to that extent, falls under the decision in the Frost case, and is invalid. I do not so construe the act. Under the terms of the act of 1929, the Public Service Commission is not required to apply the same, nor all of the regulations, to private motor-carriers for hire, as to common carriers by motor-vehicles. Even if such should be the case, this fact would not be equivalent to requiring private carriers to become common carriers for the privilege of using the public highways. A private carrier is converted into a common carrier when he pursues the business of a common carrier. Does the law or do the rules of the commission require this? One looks in vain for any such provision, express or by implication, in either, and none is pointed out. The act nowhere requires carriers of persons or property to serve all people who apply. The act nowhere expressly refers to common carriers as such, nor does it so refer to private carriers as such. Upon the contrary the act applies to all motor-vehicle carriers doing the business of transporting for hire. "The term 'motor-carrier' means every corporation or person owning, controlling, operating, or managing any motor-propelled vehicle (and the lessees, or receivers, or trustees thereof, appointed by any court whatsoever) used in the business of transporting persons or property for hire over any public highway in this State and not operated exclusively within the incorporated limits of any city or town; provided, that the term 'motor-carrier' as used in this act shall not include, and this act shall not apply to" vehicles employed in certain designated services. Ga. Laws 1929, p. 295, § 2 (c).

Thus we come to the real important question, as stated above, whether the State may regulate private motor-carriers doing business on the public highways. It is agreed by every one that the settled test of that question is whether the business is affected with a public interest. If so, it falls within the police power of the State, and may be constitutionally regulated, provided always that the regulation is reasonable and not arbitrary. That is the test of constitutionality. If the business is not affected with a public interest, then it does not fall within the regulatory powers of the State. In Munn v. Illinois, 94 U. S. 113 (24 L. ed. 77), a case

decided in 1876, it was declared, in the first headnote: "Under the powers inherent in every sovereignty, a government may regulate the conduct of its citizens toward each other, and, when necessary for the public good, the manner in which each shall use his own property." And in the second headnote: "It has, in the exercise of these powers, been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, innkeepers, &c., and, in so doing, to fix a maximum of charge to be made for services rendered, accommodations furnished, and articles sold." Chief Justice Waite, speaking for the court, said: "This brings us to inquire as to the principles upon which this power of regulation rests, in order that we may determine what is within and what is without its operative effect. Looking, then, to the common law, from whence came the right which the constitution protects, we find that when private property is 'affected with a public interest, it ceases to be juris privati only.' This was said by Lord Chief Justice Hale more than two hundred years ago, in his treatise DePortibus Maris, 1 Harg. Law Tracts, 78, and has been accepted without objection as an essential element in the law of property ever since. Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but so long as he maintains the use, he must submit to the control." In that case two Justices dissented, but for more than fifty years the decision has been followed and approved by the Supreme Court of the United States, and presumably by all of the States of the Union.

In 9 Rose's Notes on United States Reports, revised edition of complete citations, will be found more than fifty pages of annotations. These include cases where regulation of the widest variety of business activities was held to be lawful. The author of these annotations, at p. 510, observes: "The profession was not slow to realize the importance of the decision in Munn v. Illinois. Within a few weeks after the opinion was handed down, a leading law periodical ventured the prophecy that it would 'take rank in the

reports with the well known Dartmouth College case.'" The truth of the observation is evidenced by the practically unanimous acceptation of the principles stated by the courts of this country. At the time that Lord Hale wrote and at the time that Chief Justice Waite wrote in the above-mentioned case, there were no automobiles, few paved roads in the sense that we speak of modern paved roads; and consequently the problems now confronting us, if they existed at all, remained in the dreams of the scientific mind. The feature of monopoly entered largely into the determination of whether a business was affected with a public interest in olden times, but invention and commercial enterprise have immensely complicated life and increased its problems. It is manifest that other factors must now be considered, and it would seem that anything should be taken into consideration which enters into the general welfare of the public. We therefore must look to the effect of the business upon other businesses already established and already largely affecting the life of the community. We necessarily look to the terms of the act of the General Assembly; for the power to declare public policy originates with the legislative department. The question is not made in the record as to whether the legislature has power to determine whether a business is affected with a public interest, nor how far such a declaration is reviewable by the courts. Without deciding that question, it may be remarked that the act of 1929 is, by necessary implication, a declaration by the General Assembly that the business expressly named in the act is affected with a public interest.

To begin with, the act expressly applies only to operators of motor-vehicles for the carrying on of business, and therefore it is a business that the State seeks to regulate. It is a business carried on for hire for the purpose of earning money profits. Moreover, it is a business carried on through instrumentalities which are admittedly of potent danger, because of the weight and size of the vehicles and the speed at which they operate. It is carried on, not on rights of way purchased, owned, and maintained by such private carriers, but, upon the contrary, on the public highways, owned, constructed, and maintained by the State, paid for by taxes levied upon the public generally, including railway companies, with whom such private carriers are in competition. No ad valorem taxes can be collected on the property value of the rights of way from users of

highways, as is the case of railroad rights of way. This amounts in actuality to a subsidy to such operators of trucks and buses. It is a matter of common knowledge that the business carried on by these private motor-carriers has affected the business of railway companies. If the public were not concerned with the successful operation of the railways, the effect of motor-vehicle competition would be of no importance in the present discussion; but the effect necessarily is of very great public importance. It will be very generally agreed that railway transportation is indispensable, both in times of peace and of war. Next to real estate, the railways are by far the largest taxpayers. I do not here consider taxes paid on gasoline, because the amount paid by private motor-vehicles used for the business of transportation for hire is unknown. In the United States as a whole, the railway companies pay in taxes almost five hundred millions of dollars per year (more than a million dollars per day), which is nearly one fourth of their net earnings. It is estimated by Professor William Z. Ripley, a recognized authority, that the railways in the United States support railway employees and their families numbering about eight million people, and, in turn, the money expended by these families permeates every avenue of trade. These employees also in turn pay a very large sum in taxes, Federal, State, county, municipal, and school taxes. Another large sum goes for house-rent, for investments in real estate, and into every other channel to which the average wage-earner contributes; so it would seem impossible to state the limit beyond which these resources do not extend. The railroad companies in 1929 paid in taxes, in the State of Georgia, including State, county, municipal, school, and Federal tax on income derived from operations within the State, more than four and one half millions of dollars.

There was a time in the earlier history of this country when railroads were unregulated by the government, Federal or State. During that period the great evil to the railroads, and, indirectly to the public, was cut-throat competition, issuing free passes to favored persons, the practice of allowing unfair rates of freight charges, of favoring one person or business over another, and one city over another. Public opinion and the public interest finally forced the now universally approved State and Federal regulation of common carriers by rail, so as to prevent these evils. The entrance of the business of transportation for hire by motor-vehicles has brought

about new complications, new problems, and the necessity for further examination of legal principles applicable to carriers, both common and private. Motor-vehicle competition, whether it be by common or private carrier, has already reached a point of intense public interest. The State of Georgia through its legislative department has, by the motor-vehicle act of 1929 sought to somewhat remedy or lessen the rapidly growing evils flowing therefrom. If there were no other importance underlying the motor-vehicle transportation business and showing the public interest, the matter of competition would be sufficient, not only competition between the motor-vehicle lines and the railways, but competition as between motor-lines themselves,—a competition that, unless regulated, will inevitably become a cut-throat competition, if it has not already done so. Such competition, as demonstrated by experience, is ruinous alike to both the railways and the motor-vehicles. Opposition to fair regulation would thus seem not only unwise, but blind and suicidal on the part of the motor-operator. Such cut-throat competition with the railways is wholly unfair competition, because the State, exercising its police power, frequently lays its hand upon a railway and forbids the tearing up of an unprofitable section of its tracks, denying to the railroad the privilege of ceasing to operate parts of its system which have become unprofitable. It also exercises the power of controlling railroad schedules and its stopping-places. Whenever a railroad station has ceased to pay the amount of the cost of its maintenance, the railroad can not of its own will discontinue such station, but must obtain the consent of the sovereign State through its appointed agency.

On the other hand, the operators of private motor-vehicles, unless State regulated, can choose their own routes, make their own schedules, charge their own fares, parallel the profitable portions of the railroad trackage, and refuse to operate where the railroad can not profitably run. Private motor-vehicle transportation carriers, unless regulated by the State, may perform all of the service of a common carrier, derive all of its benefits, and be subject to substantially none of the penalties and burdens. They can use the State's highways, and for such privilege pay only on the basis that a private citizen operates his own automobile for his own purposes without gain. Should this court declare that the State of Georgia is impotent, under the constitution, to put its regulatory hand on

the private motor-vehicle carrier for hire, it is not difficult to foresee a time when the State's public highways will become so congested with such carriers that the private person not operating for hire will to a large extent be crowded off the highway. The dangers of travel will have so increased that in effect the public paved highways will become a congested right of way for the unregulated business of motor-vehicle transportation. Then other highways would necessarily be required. Who will build them? Certainly it will not be done by operators of such motor-vehicles if they can not even be regulated. It will be done over again by the State, by continued general taxation, both for new pavement and for new rights of way; and this in the face of adjudications by this court and others that the State may prohibit altogether the use of streets and highways by motor-vehicles for purposes of transportation business. *Schlesinger* v. *Atlanta,* 161 *Ga.* 148 (supra). It is conceded in the majority opinion, based on the *Schlesinger* case, that "the power to exclude altogether generally implies the lesser power to grant the right to use the public highways upon terms and conditions imposed by the legislature." That seems to be unimpeachable logic. And it must not be overlooked that in thus breaking down the railways in this State, the Western & Atlantic Railroad, the State's own property, must share the common fate, and by the time of the expiration of the present lease of the State's road the present lessee will have found the lease unprofitable, and it may be difficult or impossible to obtain other lessees. If the business of transporting for hire by private motor-vehicles on the State's highways does not fall within the police power of the State, it would be remarkable indeed, in view of the numerous other lines of business which, under the decisions of this court and other courts as well, have been subjected to such power; for instance, agriculture, attorneys at law, auctioneers, banking, barbers, brokers, building and loan asociations, carriers, carpet-beating by steam power, corporations, dentists, detectives, druggists, employment agencies, factors, ferries, garages and garage keepers, hackmen, hawkers and peddlers, junk dealers, innkeepers, insurance, laundries, livery-stable keepers, mining, pawnbrokers, physicians, pilots, plumbers, railroads, sale of securities, secondhand dealers, slaughter-houses, street-railroads, telegraphs and telephones, ticket-brokers, warehousemen, and wharfingers. 12 C. J. 924, § 432.

A statute prohibiting an owner from changing the manufacturers' number on motor-vehicles, does not deprive the owner of due process. People v. Johnson, 288 Ill. 442 (123 N. E. 543, 4 A. L. R. 1535). Nor is a statute requiring vendors of gasoline to collect State tax from purchasers. Pierce Oil Co. v. Hopkins, 264 U. S. 137 (44 Sup. Ct. 251, 68 L. ed. 593). The State may regulate the sale of cottonseed (*Bazemore* v. *State,* 121 *Ga.* 619, 49 S. E. 701), and even the hours within which seed-cotton may be hauled. The business of life insurance in some respects falls within the police power of the State. *Leonard* v. *American Life & Annuity Co.,* 139 *Ga.* 274 (2) (77 S. E. 41). "Within reasonable limits, statutes and ordinances may be enacted for the protection of persons and property on the public highways, as, for example, by regulating the use of vehicles on streets and other highways, requiring the registration of, and the payment of a license fee for, vehicles used on the highways, regulating the speed of street-cars, automobiles, and other vehicles, requiring the removal of obstructions from the streets, and forbidding the opening of streets without a permit." 12 C. J. 917, § 426. These complainants deny the State's power to exercise any regulation whatever. "The Supreme Court of the United States has expressly declared that the fourteenth amendment—broad and comprehensive as it is—was not designed to interfere with the police powers of the States. Barbier v. Connolly, 113 U. S. 27 (5 Sup. Ct. 357, 28 L. ed. 923)." *Cassidy* v. *Wiley,* 141 *Ga.* 339 (80 S. E. 1046, 51 L. R. A. (N. S.) 128). All courts everywhere uphold the right of a State, under its police power, to regulate the rate of interest charged, and to provide civil and criminal penalties for the exaction of usurious rates. The legislature has power, within its discretion, to determine what means are necessary to insure protection to the public. The only qualification is that such regulation must be reasonable and not arbitrary, nor palpably foreign to the legitimate purposes of such legislation. This principle is so well settled that citation of authority is unnecessary. Money-lenders, of course, are not common carriers, and moreover they may make contracts with such persons only as they choose, and on such varying terms as may be agreed upon by the parties; but the legislature may regulate the rate without violating the constitutional guaranties of due process and equal protection of the laws.

This court recently dealt with a case similar to this. *Georgia Public Service Commission* v. *Saye & Davis Transfer Co.,* 170 *Ga.* 873 (supra). Chief Justice Russell wrote the opinion, and, among other things, stated that the complainant was subject to the regulatory control of the Public Service Commission, whether it was a common carrier or a private carrier, because in either event the business was affected with a public interest. Among the authorities cited was Rutledge Co-op. Asso. *v.* Baughman, 153 Md. 297 (138 Atl. 29, 56 A. L. R. 1042) ; also Barbour *v.* Walker, 126 Okl. 227 (259 Pac. 552, 56 A. L. R. 1049), which dealt with an Oklahoma statute similar to the Georgia act, and where that court declared: "A private motor-carrier operating over the public highways of the State, though without regular or fixed time schedules between fixed points in the transportation of commodities for hire under separate contracts with several principal business concerns located and doing business in one of such points, is a 'motor-carrier' within the meaning of chapter 113, S. L. 1923, and is subject to control and regulation by the provisions of law therein provided." All of the Justices concurred in the result reached by the Chief Justice. Mr. Justice Hines based his concurrence on the ground that the applicant was a common carrier. It has been repeatedly held by the courts, that, in the exercise of the police power, a State may regulate the charges of a public utility, even though in so doing such regulation may result in nullifying a contract, without violating the United States constitution forbidding a State to impair the validity of a contract. Union Dry Goods Co. *v.* Georgia Public Service Commission, 248 U. S. 375 (39 Sup. Ct. 117, 63 L. ed. 309, 9 A. L. R. 1420). If it were otherwise, the police power of the State could be practically destroyed by the simple device of making contracts. *Leonard* v. *American Life & Annuity Co.,* 139 *Ga.* 276 (77 S. E. 41) ; *Washington* v. *Atlantic Coast Line R. Co.,* 136 *Ga.* 644 (71 S. E. 1066, 38 L. R. A. (N. S.) 867) ; *King* v. *State,* 136 *Ga.* 709, 716 (71 S. E. 1093) ; 6 R. C. L. 347, § 341.

The parts of the State and Federal constitutions with which the act is said to be in conflict are set out in the majority opinion and the statement of the case. It would uselessly consume space to repeat them here. To my mind none of the provisions of the constitutions amount to a barrier to the full and complete control of the business of operating motor-vehicles for hire, whether by private

carriers or common carriers, whether they strictly confine themselves to paved highways, or, as they contend, occasionally go off into unpaved roads and lanes. Every one knows that it is on the main paved highways that such carriers will find profitable business, and that the travel on unfrequented streets and lanes constitutes no considerable part of their transportation business. In a special concurrence in *Georgia Public Service Commission* v. *Saye & Davis Co.*, supra, the writer expressed his views on this question, including the view that the actual ruling made in *Frost v.* Railroad Com., 271 U. S. 583 (supra), went only to the extent of holding that a State can not constitutionally compel a private carrier to become a common carrier.

Before closing, it should be mentioned that for some reason the petitioners have made the comptroller-general of the State a defendant and sought to enjoin him from collecting the tax provided in the motor-vehicle act of 1929. That act expressly declares that the tax is only to be levied on and paid by such motor-carriers as have obtained from the public service commission a certificate of convenience and necessity as provided in the act. These petitioners have not obtained that certificate, and this entire proceeding is brought to avoid the necessity of ever obtaining them. It is plain that the comptroller-general can levy and collect the tax only when these certificates have been obtained, and under the pleadings and the evidence there is nothing to indicate that the comptroller-general has the slightest thought of attempting to collect that tax before petitioners have obtained certificates from the public service commission. Therefore it is obvious that the case should have been dismissed as to the comptroller-general.

I am authorized to say that Presiding Justice Beck concurs in the views herein expressed.

RUSSELL, C. J. I have carefully considered the bill of exceptions and the record, as well as the majority and minority opinions prepared by Justices Hines and Gilbert respectively. The commanding logic and reasoning of both opinions have captivated my fancy and commanded my highest admiration, but yet I am not prepared to concur in the views of either. I adhere to the opinion which I announced in *Georgia Public Service Commission* v. *Saye & Davis Transfer Co.*, 170 *Ga.* 873 (supra), in which it was held: "In the use of public highways in this State which are the property of

the State, the power of regulation is vested in the General Assembly, and that body may authorize the public-service commission to prescribe the conditions upon which a public highway may be used by a carrier in the transportation of goods, provided such regulation does not tend to create a monopoly or require the carrier to change his status in violation of the due-process clause of the fourteenth amendment to the U. S. constitution." In the third headnote we held: "Under the principles stated in the first headnote, it is immaterial, and therefore unnecessary to decide, whether the carrier is private or common. In either event, the business is affected with a public interest, and therefore within the power of the public-service commission for regulation by prescribing the terms upon which the business of such carrier may be conducted upon the public highways of the State." It is said by Mr. Justice Hines that he expresses the opinion that under the facts in that case Saye & Davis Transfer Company were common carriers, and this may be true, but the report of the case does not evidence that Mr. Justice Hines went further than to say that his concurrence was based upon the fact that "Saye & Davis Transfer Co. were expressly chartered for the purpose of carrying on a public business, consisting of transporting freight and passengers over the public highways of this State. This company was not chartered to do business as a private carrier, and having been incorporated as a public carrier, this company is subject to the jurisdiction of the public-service commission of Georgia for all purposes expressed in the motor-carrier act of 1929. With the light before me and that expressed in the opinion upon the question, I do not pass upon the question whether the State can regulate the rates of private carriers. I leave this question open for future consideration, when it arises in a proper case. I am clearly of the opinion, however, that the legislature can regulate both classes of carriers in the use of the public highways of this State. Whether the power extends to the regulation of the rates of private carriers, the routes they shall occupy, and other terms on which they do business, I leave open." Judge Gilbert, in his special concurrence, starts his opinion by saying: "I am of the opinion that Saye & Davis Transfer Company is a common carrier." So far as the record shows, Associate Justices Beck, Atkinson, and Hill expressed no opinion further than that they concurred in the result. To concur in the result, from my own experience, may

mean that they go no further than that, because the concurrant in a case agrees to nothing more than the result reached, as expressed in the headnote. It may be that in my own case I have sometimes concurred, when concentrating on some important principles involved in some case which I was about to read to the court in private consultation, when I really would not clearly catch and apprehend all that had been said in the opinion, and at some time or other a similar reason may have influenced other members of the Supreme Court, even when its personnel was not the same as it now exists. So far as the legislative branch of the threefold government in Georgia can prescribe rules of practice and procedure to the judicial department, supposed to be independent, the Code, § 6202, declares: "No decision shall be delivered ore tenus; but the same shall be announced by a written synopsis of the points decided, which shall be delivered during the term at which the decision was made. And no decision shall be published in the reports until the said decision shall have been revised by each of the judges presiding in the case." And so I apprehend, as there was no special concurrence or entry of any kind as to the syllabus, that the concurrence only in the result must be confined to the opinion delivered by me in the *Saye & Davis* case, supra.

In confirmation of my opinion, the dissent to the judgment rendered for three of the other Justices is dissented from, based upon the authorities relied upon by me in stating that the highway commission is empowered to regulate the business of transportation upon the public highways of this State by reason of the fact that the business affects the public interest—everybody is concerned. Prior to the decision in *Public Service Commission* v. *Saye & Davis,* supra, I joined Judge Hines in dissenting from the opinion of the majority in *Bowden* v. *Public Service Commission,* 170 *Ga.* 505 (supra). I was of the opinion that the court erred in failing to exercise equity jurisdiction and to grant an interlocutory injunction against the enforcement of the motor-carrier act of 1929. I adhere to my dissent in that case, as I do to my opinion in the *Saye & Davis* case. Both of the opinions referred to quote approvingly from the case of *Schlesinger* v. *Atlanta,* 161 *Ga.* 148 (supra), and concede the proposition that the State has the power to prohibit the use of a public highway to its citizens, regardless of the question whether or not a monopoly might thereby be

created. I dissented in the *Schlesinger* case, and I likewise dissented in a subsequent case involving the same point, that of *Nance* v. *Savannah,* 162 *Ga.* 395 (133 S. E. 744). Subsequent observation and reflection has strengthened the views I entertained when I dissented in both of these cases. I still dissent "quoties toties," and so it is at least not a six-judge case, though the division in the court was five to one. In so far as the *Schlesinger* case is cited as authority, it still can not bind me as controlling authority. Prohibition and regulation are very far from being synonymous terms. Nor is prohibition a species of regulation. When a sovereign State determines absolutely to prohibit any business, it is absolutely futile to talk about regulating a business which has been absolutely eradicated, outlawed, and extirpated. So that I did not concur in the thought that the State can prohibit the use of the public highways to any person engaged in a lawful business which is complying with all the restrictions and regulations imposed by the government. Nor can I concede that the question is pertinent in this case. Construing the motor-carrier act as I do, I am still prepared to hold that the public-service commission has the right to regulate the business of people engaged in hauling commodities for hire, whether the person is engaged in the business as a common carrier for hire (who is bound to accept freight from everybody who may offer to pay the rate fixed by the public-service commission, and to safely deliver it at its destination at his peril, because no excuse will avail him for not delivering it, except the act of God or other providential causes which may be deemed to be such, or the act of the public enemy) or as a private carrier. The term private carrier defines, in my opinion, one who hauls only for a clientele, limited and selected by himself, under a special contract from which the public are excluded. The word "carrier" denominates one who is in the habit, or accustomed to carrying, whether the word "carrier" follows a common carrier or a private carrier. Therefore a private carrier is one who is accustomed as his business to carry. It matters not whether he is a common carrier or a private carrier. However, if he is accustomed to carrying as a business, it is my opinion, as expressed in the case of *Saye & Davis,* that he is within the jurisdiction of the public-service commission, because he is as much in the business of carrying as a common carrier, though the fact that he is a private

carrier may relieve him from the obligation to deliver required of a common carrier which we have already mentioned.

I am of the opinion that the General Assembly desired both of the classes to which we have referred to be under the jurisdiction of the public-service commission. The caption of the act speaks for itself; but I do not believe that the General Assembly ever intended to require a license of public service and convenience, and fee or tax to be paid therefor, in case of one who only occasionally uses his own machine which was ordinarily not engaged in transportation of articles for any one except for his own use. The word "carrier," as applied to one who operates a motor-vehicle, imports and implies continuous transportation. The word is not appropriate to convey the thought of sporadic and occasional use of a machine as a mere matter of occasional convenience rendered by one friend to another. If a minister of the gospel who happened to own an automobile should, as a mere kindness, agree to bring the furniture and other personal effects of a very poor old woman from Atlanta to Macon, by borrowing a trailer and hauling these effects to Macon, he could not well be classified as a carrier, either common or private, within the terms of the motor-carrier act. Even if he be classified as a private carrier, he would not be required to take out a certificate of public service and convenience. And so if I should get a neighbor who was going home from Atlanta, and who had a truck for the purpose of hauling his own logs to a saw-mill, or his own hay to his barns, or his own cotton to the gin when in the seed, or when baled to convey it to wheresoever he wished for the purpose of storage and sale, and I should get him, know-his truck would be empty on his return, to bring back to me a purchase of lumber or hardware, it is not my opinion he could be called a carrier and subject to the provisions of the motor-carrier act and subjected to the penalties imposed upon carriers who are required to take out a certificate of public service and convenience, and to pay a heavy license tax therefor. The motor-carrier act was never intended to include those who might occasionally use vehicles that could be used for such transportation as was not in any way affected with a public interest. In *Saye & Davis,* supra, I attempted to point out that the public interest was a criterion of the liability of a carrier, whether common or private, to the provisions of the motor-carrier act, and cited authorities in sup-

port of my position. Naturally I can not agree with the views of Judge Hines at this point. I can agree with him that the evidence in the case at bar may make McIntyre a common carrier, because apparently he never refused to haul for any one who would make a contract with him to haul. He was a common carrier, except he was endeavoring by contract to escape the rule of liability imposed upon a common carrier, and the device adopted was unsuccessful; but if a carrier declined to haul for only a few customers, or for only one, then his business might be more profitable than that of many a common carrier, and he would be subject, as a private carrier, to the same license of public service and convenience, and the payment of the charges, as imposed by the public-service commission, and in his continuous carrying, although for only a private clientele, he would have to furnish to the public-service commission, and be governed thereby, the fixed schedule, termini, etc., prescribed for common carriers.

Nor can I concur in the learned opinion of Mr. Justice Hines, for the reason that only one question was presented for determination by the bill of exceptions, which was, whether the evidence adduced before his honor, Judge Moore, authorized the grant of injunctive relief. The lower court did not pass upon the demurrers, and therefore there was no judgment in the lower court upon a majority of the subjects with which the opinions in this case deal. It may be that under the powers conferred upon this court as to giving directions as to the final disposition of a case, the law on a certain proposition may be declared, although that question was not before the lower court for solution; but as I understand the rule, this court can not authoritatively determine any question which the lower court has not tried; and for that reason statements made by the court upon propositions not directly involved in the review are generally called obiter dicta. It appears from the record that Judge Moore did not pass upon the demurrers, though they were filed and presented, and he based his decision entirely upon the evidence before him, and refused to assist the petitioners by means of granting an interlocutory injunction. If there is any inference to be drawn from the failure of the court to enter an order as to the demurrers and proceed to the merits of the case, it must be inferred that he was of the opinion that the demurrers were not good, and that tacitly he overruled the demurrers; for

if he had sustained the demurrers, that would have been an end of the case. For this reason, I am of the opinion it is at least very doubtful whether the court can now proceed to decide questions upon which the lower court did not pass. For the same reason, I can not affirm the ruling of the court upon the reasons presented in the well-considered opinion of Mr. Justice Gilbert, in which Beck, P. J., concurs, because this opinion is also bottomed upon the *Schlesinger* case, supra, and answers the argument of Judge Hines, which is that in cases of a common carrier, as well as private carriers, the application of the motor-carrier act is proper in any transportation which is affected by a public interest. I am of the opinion that the judge of the superior court, in his ruling as to the interlocutory injunction, was correct. I am further of the opinion that no ruling was invoked as to other matters dealt with in the opinions. Were I to cast my vote for affirmance, the only result would be to cause an equal division of the court, and thereby cause the judgment of the lower court to be affirmed by operation of law. For that reason, there would be no decision by the court, though the opinions written in the case should by law be published, and opportunity thus afforded whereby the public would be beneficially informed. The publication at least might be very suggestive to the General Assembly, and produce legislation which would solve the conflicting views of the court upon the subject of carriers using motor-trucks. But the publication of the different views entertained by the members of the court does not speed or promote the adjudication of legal issues; and so I prefer, for myself, to abstain from participation in the final judgment, and to be regarded as not participating in the judgment.