GEORGIA PUBLIC SERVICE COMMISSION *et al. v.* SAYE &
DAVIS TRANSFER COMPANY.

No. 7549.  JULY 26, 1930.

*T. M. Cunningham* and *S. J. Smith Jr.,* for plaintiff in error.
*A. S. Bradley,* for persons at interest, not parties of record.
*Troutman & Troutman* and *Robert S. Sams,* contra.

RUSSELL, C. J.   The Saye & Davis Transfer Company brought
a petition to enjoin the Public-Service Commission of Georgia from
"attempting to regulate the business of petitioner and from pros-
ecuting petitioner or any of its agents, employees, or officers for
alleged violation of" the motor-carrier act of 1929.   Ga. L. 1929,
p. 293.   The general purposes of the act are fully indicated
in the title:  "An act to regulate the business of transporting
for hire persons and property by motor-vehicles on the public
highways of this State; to define motor-carriers and to subject
them to the jurisdiction and regulatory powers of the Georgia Pub-
lic-Service Commission, also to the laws applicable to common
carriers of goods and carriers of passengers; to prohibit the opera-
tion of vehicles by motor-carriers unless they obtain a certificate of
public necessity and convenience, and to prescribe the conditions on

which such certificates shall be issued and continued in force, and the fees to be paid therefor; to authorize the commission to prescribe just and reasonable rates, fares, and charges of motor-carriers, and the form, filing, and publication of tariffs therefor; to prohibit motor-carriers from charging or receiving greater, less, or different compensation than that prescribed; to prevent unjust discriminations; to make provision with reference to proceedings before the commission and review of its orders; to make provisions concerning the carrying of white and colored passengers, the carrying of baggage, discontinuance of operations; to give the commission power to require motor-carriers to erect, use, or lease depots, to fix schedules, or the number, kind, or character of equipment used; to authorize railroad companies to operate on the public highways as motor-carriers, and to own stock in corporations organized or operating as motor-carriers; to provide how motor-carriers shall be taxed for ad valorem property taxes; to prescribe registration and license fees to be paid by motor-carriers; to prohibit any political subdivision of· the State from imposing registration or license fees on any motor-carrier licensed under this act; to prescribe punishment for violations of this act and of the orders of the commission; to authorize the commission to employ such persons as may be necessary for the enforcement of this act; to provide compensation for the members of the Georgia Public Service Commission for the extra duties required by this act; and for other purposes."

The act is attacked as unconstitutional, (a) because it violates article 1, section 1, paragraph 3, of the State constitution (Code, § 6359), relating to due process of law; (b) because it violates the same provision of the Federal constitution; (c) because it violates article 1, section 3, paragraph 1, of the State constitution (Code, § 6388), which prohibits property being taken or damaged for public uses without adequate compensation being first paid, in that it converts petitioner's business from that of private to that of common carrier; (d) because it violates article 1, section 3, paragraph 2, of the State constitution (Code, § 6389), forbidding any retroactive law or law impairing the obligation of contracts, in that it makes unlawful the operation of petitioner's business which was in existence before and at the time the act was passed. Rules and regulations of the commission adopted pursuant to said act,

and to carry out same, are attacked as unconstitutional, "in that they attempt to subject petitioner's business to public control and to convert its business as a private carrier into that of a public utility without just compensation." Other facts are stated hereinafter.

It appears from the record that the Saye & Davis Transfer Company is a corporation created by the superior court of Morgan County for the purpose of doing business as a common carrier. Before incorporation there was a partnership existing between the applicants for charter. Upon learning that the Public-Service Commission of Georgia proposed to take jurisdiction of their business, Saye & Davis filed a petition in Fulton superior court for injunction. A temporary restraining order was issued, and upon a hearing an interlocutory injunction was granted on November 22, 1929. The exception is to that judgment. In the petition it is contended, that, regardless of its corporate character, the petitioner is not a common carrier but a private carrier; that it does not engage in the business of a common carrier nor hold itself out as such, and for a considerable period of time has not transported any goods except for five customers, who are Sears, Roebuck and Company, Rogers Stores Inc., Gulf Refining Company, Wofford Oil Company, and McConnell & Sons Company, and has neither the intention nor the facilities for transporting goods for any additional customers. It is therefore insisted that this carrier is not under the jurisdiction of the commission. In an answer filed by the commission it is insisted that petitioner is a common carrier; but that if it were a private carrier only, it would be subject to regulation by the commission under the act approved August 29, 1929, and known as the motor-carrier act of 1929. The commission further contends that petitioner is subject to regulation because its business is affected with a public interest. Besides the immediate parties, some 25 short-line railways of the State have filed a brief as amici curiæ. The defendant in error relies upon the case of Frost &c. Co. v. Railroad Commission of California, 271 U. S. 583 (46 Sup. Ct. 605, 70 L. ed. 1101). We think, however, that the controlling point is not one of differentiation but public interest. If this transfer company can make contracts as a private carrier with five customers, it can just as lawfully do so with five hundred others, and in each of the additional instances it would be as much a

private carrier as before. The result would be that the State, which owns the highways, would be compelled to keep up the track used by this private carrier, maintain and repair it, and be helpless when the carrier should tauntingly say, "I used your road in my business and let the citizens of the State keep up my means of transportation."

Numerous courts have decided that where the use of the highway is by one who conducts a business which affects the public interest, such business is subject to regulation by the State. The State has a proprietary right in and to its highways, and therefore has the power to prohibit or regulate and control the use of its highways for purposes of private gain. In *Hazleton* v. *Atlanta,* 144 *Ga.* 775 (87 S. E. 1043), as in other cases, this court has decided that the streets and highways of the State belong to the public, and that it is within the power of the State to prohibit or condition the use of them by carriers for hire, that this power is vested in the legislature and may be given or withheld, and no constitutional right, State or Federal, to use the highways for private gain is invaded. This power is upheld in the case of Frost &c. Co. *v.* Commission, supra, relied on by the transfer company. The business of a carrier for hire is necessarily affected with a public interest. Even if the carrier has not dedicated its property to the public use as a common carrier, the very nature of the business is such that it is affected with a public use. In Rutledge Co-op. Asso. *v.* Baughman, 153 Md. 297 (138 Atl. 29), a co-operative association was chartered to market and transport milk and other farm produce and procure and deliver for its members such materials and supplies as might be needed, and its business of transportation was restricted to its members. If the defendant in error in this case can say that it is relieved of regulation because it transports only for five customers, with how much more force might this co-operative association insist upon the same when it only transported materials for its members. Yet the Court of Appeals of Maryland held that this association was subject to regulation under an act that was not an unconstitutional exercise of legislative power. The court also held that the State has power to prevent appropriation of highways dedicated to use of public, by persons using them for transportation for hire to such an extent as to render them unsafe for public use. In the opinion, Judge Offutt declared: "Conced-

ing, for the purpose of this opinion, that the appellant is a private carrier in its relation to the general public, and that the legislature had not the power to convert its status as such into that of a common carrier, it does not follow that section 259 is void, because that section does not in terms or by implication affect the status of the appellant as a private carrier, nor does it enlarge or change the scope of its corporate powers, functions, or duties in the operation of the business in which it is engaged. But what it does is to impose upon the operation of that business the same limitations and restrictions which it imposes upon common carriers. And the question therefore is, has the legislature the power to require a private carrier, before operating a business such as that conducted by appellant over the public highways of the State, to first secure the permission of the public-service commission? The power conferred by these two sections is prohibitory, not regulatory; and the question may be further narrowed to this: Has the legislature the power to authorize the public-service commission to prohibit the appellant from transporting freight for hire for its members over the public highways of the State, when in its judgment such prohibition is essential to the public welfare? We have said that the statute does not change the status of the appellant as a private carrier at common law in so far as its relations to the general public are concerned, because the test generally recognized for distinguishing a private from a common carrier is that a common carrier is obliged, within the limits of its ability, to serve all who apply, while a private carrier is under no such obligation. Citing Michie on Carriers, 312; Hutchinson on Carriers § 48, etc. Quoting from its former decision in Mayor &c. v. C. & P. Tel. Co., 131 Md. 446 (102 Atl. 751), the court continued: "'The legislature of 1910 took up, and, for the first time in this State, enacted a law for the purpose of regulating in various ways the class of corporations or firms conducting public utilities. The grant of power as contained in the act, while in general language, was intended to be extremely comprehensive, . . that the commission created by the act might upon its own initiative regulate the changes demanded, . . so that the said commission should, in the interest of the public, be invested with ample powers for regulation, both as to service and charges. . . It was a jurisdiction determined by the subject-matter, rather than any other consideration.'"

The motor-carrier act now under consideration is very similar to the Maryland statute, and so it can be well said, as was said in the case above, that the jurisdiction of the public-service commission must be determined by the nature of the subject-matter rather than any other consideration. The gist of the decision in the Frost case, supra, so far as the case at bar is concerned, is that it was not within the power of the State to convert a private into a common carrier; but, as we have shown, in instances where the public interest is affected by a carrier's use of the public highways it is immaterial whether the carrier itself be public or private. In the Frost case the Supreme Court of the United States had under review the decision of the Supreme Court of California construing the auto stage and truck act of California, as amended in 1919, and held: "Assuming that the use of its highways by private carriers for hire is a privilege which the State may deny, it can not constitutionally affix to that privilege the unconstitutional condition precedent that the carrier shall assume against his will the burdens and duties of a common carrier." It was further held that the requirement that private carriers should become common carriers was a violation of the due-process clause of the fourteenth amendment. Recognizing that we are bound by the decisions of the Supreme Court of the United States, it does not appear that the decision of the case at bar is affected by the ruling last stated, for the reason that there is no requirement in the Georgia motor-carrier act that the carrier, in order to receive a certificate of convenience and necessity, shall become a common carrier. On the contrary we are dealing with the question as if the defendant in error were doing business as a private carrier, although it appears that it was incorporated as a common carrier, and we think the act provides for the regulation of this company even as a private carrier. However, even were we to treat it as a common carrier, we should not be within the inhibition of the Supreme Court of the United States against compelling this company to become a common carrier, because it has already asked the superior court of Morgan County to create it as a common carrier and so declare it to be under the law. In Barbour v. Walker, 126 Okl. 227 (259 Pac. 552), dealing with an Oklahoma statute similar to the Georgia act in that it provided for the regulation of the use of public highways for motor carriage for hire, and there being nothing in that .

act requiring carriers to become common carriers as a condition precedent to obtaining a certificate of public convenience and necessity, the court held: "A private motor-carrier operating over the public highways of the State, though without regular or fixed time schedules between fixed points in the transportation of commodities for hire under separate contracts with several principal business concerns located and doing business in one of such points, is a 'motor carrier,' within the meaning of chapter 113, S. L. 1923, and is subject to control and regulation by the provisions of law therein provided."

So far as we are aware, the Supreme Court of the United States has never held that, where the transportation business of a carrier was affected with a public interest, it was not within the power to regulate it in the use of the State's own highways. In the Pipe Line Cases, 234 U. S. 548, the Supreme Court held that the Standard Oil Company, which owned and controlled a combination of pipes, though the only oil transported was oil· purchased prior to transportation, was a pipe-line carrier under the provision of law then being construed, and said: "While the control of Congress over commerce among the States can not be made a means of exercising powers not committed to it by the constitution, it may require those who are common carriers in substance to become so in form." In the Lottery Case, 188 U. S. 321 (23 Sup. Ct. 321, 47 L. ed. 495), the Supreme Court upheld the power of Congress to control matters affected with a public interest; and likewise, or to the same effect, are the rulings in Brass v. North Dakota, 153 U. S. 391, 14 Sup. Ct. 857, 38 L. ed. 757). In that case, it is true, the property had been dedicated to the public use, but the decision was not placed upon the dedication, but was controlled by the fact that it was affected with a public interest. In Hammond Packing Co. v. Montana, 233 U. S. 331 (34 Sup. Ct. 596, 58 L. ed. 985), the court held that it was within the power of the State to restrict or even forbid the manufacture of any article of commerce whenever it appeared that it was affected with a public interest. See also Stone v. Farmers &c. Co., 116 U. S. 307 (6 Sup. Ct. 334, 29 L. ed. 636). In that case the historical background was discussed, and the power to control the transportation business was dealt with. The doctrine there was so thoroughly gone into with respect to railroad carriers that it has not since been seriously

questioned; and in our opinion it should be applied to all carriers, no matter what the means of locomotion, unless there would be an interference with the property rights of the person or corporation engaged as carrier, as by changing his legal status or by forcing a private carrier to become a common carrier. We think that the principle that the States may exercise the power of regulation, even the fixing of rates, in the conduct of a business is very pointedly illustrated in the case of German &c. Ins. Co. *v.* Lewis, 233 U. S. 389 (34 Sup. Ct. 612, 58 L. ed. 1011, L. R. A. 1915C, 1189), where a State statute regulating rates of an insurance company was upheld. Certainly the property of the insurance company was not dedicated to any public use. The court was obliged to recognize the right of the insurance company to make or decline contracts of insurance at its pleasure; yet it recognized the doctrine that the business was affected with a public interest, and the court upheld the right of the State of Kansas to fix insurance rates.

So we are of the opinion that the court below erred in granting the interlocutory injunction, thereby interfering with the exercise of a power lawfully within the jurisdiction of the public-service commission.

*Judgment reversed. All the Justices concur, Gilbert, J., specially.*

Beck, P. J., and Atkinson, Hill, and Hines, JJ., concur in the result.

Gilbert, J., specially concurring. I am of the opinion that Saye & Davis Transfer Company is a common carrier. They were so incorporated, and they are transporting goods for hire on the public highways of the State. The fact that they are restricting themselves at any given time to a limited number of persons, with whom they make individual contracts, does not make them private carriers. The character of transportation is the same as if they were common carriers. The charter itself announces to the world that the company is a common carrier, and the world is authorized to infer that their transportation facilities are being offered to every one as far as their facilities will permit. In Terminal Taxicab Co. *v.* District of Columbia, 241 U. S. 252 (36 Sup. Ct. 583, 60 L. ed. 984, Ann. Cas. 1916D, 765), the Supreme Court said: "In determining whether a corporation is or is not a common carrier, the important thing is what it actually does, and not what its charter says it may do." This case concerned the business of a taxicab

company, and in the opinion it was said: "No carrier serves all the public. His customers are limited by place, requirements, ability to pay, and other facts. But the public generally is free to go to hotels if it can afford to, as it is free to travel by rail, and through the hotel door to call on the plaintiff for a taxicab. We should hesitate to believe that either its contract or its public duty allowed it arbitrarily to refuse to carry a guest upon demand. We certainly may assume that in its own interest it does not attempt to do so. The service affects so considerable a fraction of the public that it is public in the same sense in which any other may be called so. German Alliance Ins. Co. v. Kansas, 233 U. S. 389 [supra]. The public does not mean everybody all the time. See Peck v. Tribune Co., 214 U. S. 185, 190 [29 Sup. Ct. 554, 53 L. ed. 960, 16 Ann. Cas. 1075]." And compare Cushing v. White, 101 Wash. 172 (172 Pac. 229); Independent Truck Co. v. Wright, 275 Pac. 726. Civil Code (1910), §§ 2711, 2712, 2729.

Section 2-(c) of the motor-carrier act (Ga. Laws 1929, p. 295) provides: "The term 'motor carrier' means every corporation or person . . operating . . any motor-propelled vehicle . . used in the business of transporting persons or property for hire over any public highway in this State and not operated exclusively within the incorporated limits of any city or town." According to the terms of this act it applies to "motor carriers" whether they are common or private carriers. The motor-carrier act does not undertake to compel a private carrier to become a common carrier in order to use the public highway for purposes of transportation. In this particular it differs from the California act, as construed by the Supreme Court of California. Frost Trucking Co. v. Railroad Commission, 70 Cal. Dec. 464. Except in the caption of the act, it contains no reference to liabilities of a common carrier, and reference in the caption is not sufficient to constitute binding legislation. The company, even if not a common carrier, is not strictly a private carrier, as are vehicles operated upon the public highways, not for hire, but for the convenience and benefit purely of the owners. Motor-vehicles operated for hire, as in the present instance, are affected with the public interest and come within the police powers of the State. They are dependent upon collecting hire from some of the public, and are using the public highway. Munn v. Illinois, 94 U. S. 113 (24 L. ed. 77); Lottery Case, 188

U. S. 321 (supra) ; Hammond Packing Co. v. Montana, 233 U. S. 331 (supra) ; German Alliance Insurance Co. v. Kansas, supra; Pipe-Line Cases, 234 U. S. 548 (34 Sup. Ct. 956, 58 L. ed. 1459). The police power of the State has been properly termed a law of self-preservation. It is inherent in sovereignty. The State being sovereign, its powers must exist to protect the lives and safety of the people and the property of the citizen. A motor-vehicle using the public highway of the State for hire is engaged in business on the public highway. This court has held: "Individuals do not have the inherent right to conduct their private business in the streets of a city, and the State or city can prohibit the owners or operators of jitneys and buses from transporting passengers for hire in such vehicles upon the streets of a city." *Schlesinger* v. *Atlanta*, 161 *Ga.* 148 (129 S. E. 861). "The contention most pressed is that the act unreasonably and arbitrarily discriminates against those engaged in operating motor vehicles for hire, in favor of persons operating such vehicles for their private ends, and in favor of street-cars and motor-omnibuses. If the State determines that the use of streets for private purposes in the usual and ordinary manner shall be preferred over their use by common carriers for hire, there is nothing in the fourteenth amendment to prevent. The streets belong to the public and are primarily for the use of the public in the ordinary way. Their use for the purposes of gain is special and extraordinary, and, generally at least, may be prohibited or conditioned as the legislature deems proper." Packard v. Banton, 264 U. S. 140, 144 (44 Sup. Ct. 257, 68 L. ed. 596).

In so far as the questions here involved are concerned, there is no difference between the status of a city street and a public road or highway. In the *Schlesinger* case this court quoted as follows from *A. & W. P. R. Co.* v. *A., B. & A. R. Co.,* 125 *Ga.* 529, 545 (54 S. E. 736), as follows: "A street is a highway in a city or town, used by the public for the purpose of travel, either by means of vehicles, or on foot." In the same case it was further stated: "Streets and highways are not intended to furnish places of business to individual members of the public. An individual can not maintain a place of business on a public road." In *Cottle* v. *Wilkes*, 141 *Ga.* 499 (81 S. E. 214) this court affirmed a judgment enjoining the hauling of large sawmill logs on two-wheel carts over public roads and bridges, whereby the roads were cut into ditches and

gullies and the bridges broken.. It will be noted that the use, and not the abuse, of the roads and bridges was restrained." Too much space would be required to quote all that was said in the opinion in that case. It will be sufficient to quote the summing up, as follows: "The streets of a city belong to the public, and are primarily for the use of the public in the ordinary way. The ordinary use of the streets, as we have seen above, is for travel; and to this may be added transportation of goods by their owners to and from their residences or places of business. Transportation of travelers or goods by common carriers for hire does not fall within the ordinary way in which streets are used. Their use for the purpose of gain is special and extraordinary, and may be prohibited or conditioned as the legislature or municipality deems proper. The conduct of the business of a carrier of passengers for hire over the streets of a city is a mere privilege, and not a natural or inherent right of the individual conducting such business. Being a privilege, it can be given or withheld; and may be given to members of one class and denied to those of another class. If the State or city determines that the use of the streets for private purposes in the usual and ordinary manner shall be preferred over their use by common carriers for hire, there is nothing in the constitution of the United States or this State which prohibits such action. This principle seems bottomed on sound reasoning, and is well settled by a great majority of the courts of last resort in this country." In support of the above, numerous authorities were cited; and the court went on to say: "The due-process and equal-protection clauses of our Federal and State constitutions are applicable to rights alone, and have no reference to mere privileges which may be bestowed or withheld by the State or municipality."

The effect of the growing business of operating motor-vehicles for hire on the public highways must be apparent to every man of ordinary sense. Courts can not be blind to those things which are apparent to every citizen. The construction and maintenance of the public highways is of vast importance to the happiness and prosperity of all. Upon our public highways are expended immense sums of money, time, and labor, all of which must be supplied by the general public. The congestion, to say nothing of pure accidents and negligence, is exacting a toll of human lives and destruction of property that is appalling. It constitutes an increasing menace.

The size and weight of such motor-vehicles constitutes an extra burden on the wear and tear of highways, and adds to the dangers. It is unthinkable that the sovereign State can not lay its hand on the traffic for the purpose of regulation, control, or even prohibition where regulations are not obeyed. Such is a necessity for the public safety and because of the heavy burden of construction and maintenance. The State's constitutional power to tax and to regulate private operations of automobiles using the public highways is in this day nowhere denied. The State may require owners, as well as chauffeurs, to obtain a license, and requirement of insurance by all to respond for damage to person and property may soon follow. Packard v. Banton, supra. It is no wide stretch to hold that if an operator of a motor-vehicle on public highways charges hire from any one, the State may exercise its inherent power to regulate the hire, so that it shall be reasonable. Rutledge Co-op. Ass'n v. Baughman, 153 Md. 297 (138 Atl. 29) ; Barbour v. Walker, 126 Okla. 227 (259 Pac. 552).

The views above expressed are not in conflict with the Frost case, supra. To my mind, a wrong impression widely exists as to what was actually ruled in the Frost case. The fundamental proposition there ruled was that a State can not, by legislation, convert a private carrier into a common carrier against the latter's consent, without complying with the constitutional requirements. There were three dissents in that case, filed by Justices Holmes, McReynolds, and Brandeis. Mr. Justice Holmes, in the opinion filed by him, said, in part: "The point before us seems to me well within the legislative power. We all know what serious problems the automobile has introduced. The difficulties of keeping the streets reasonably clear for travel and for traffic are very great. If a State speaking through its legislature should think that, in order to make its highway most useful, the business traffic upon them must be controlled, I suppose that no one would doubt that it constitutionally could, as, I presume, most States or cities do, exercise some such control. The only question is how far it can go. I see nothing to prevent its going to the point of requiring a license and bringing the whole business under the control of a railroad commission so far as to determine the number, character, and conduct of transportation companies and so to prevent the streets from being made useless and dangerous by the number and lawlessness of those who

seek to use them." Although this is a dissenting opinion, its logic seems unassailable.

In 26 Columbia Law Review, No. 8, beginning on p. 954, will be found an elaborate and instructive discussion of "Motor-Carrier Regulation: Federal, State, and Municipal." The authors begin with the statement: "The amazing rise of the automobile as a universal mode of transportation has brought with it a host of problems which the State has been called upon to face," and on p. 962 there are stated conclusions which the authors have reached, after a consideration of numerous authorities, which are well worth quoting. They are as follows: "It has been quite generally believed, however, that private carriers can not be required to obtain certificates of convenience and necessity. This impression is based upon a misapprehension of the recent Supreme Court decisions, and has no basis in fact. Private and public motor-carriers both differ from other carriers and service corporations, in that they employ, as an integral part of their operation, facilities furnished and maintained by the public. Both present the problems of crowded highways and disastrous competition. It is submitted that, within the bounds of the practical capacity of the commissions to act, private carriers, equally with public ones, should be required to obtain certificates of convenience and necessity. Regulation by means of such certificates is reasonably devised to protect the public from the abusive use of the roads, from the evils incident to unregulated competition, and from the physical dangers involved in motor-carrier operation. The following conclusions concerning the regulation of private carriers seem justified by the Supreme Court decisions.

■ Private carriers can not, by legislative command, be converted into public carriers; that is, the entire system of traditional common-carrier duties, including such obligations as continuity and equality of service, can not be imposed.

■ Where a statutory provision for the certification of private carriers is not severable from other provisions improperly imposing common-carrier obligations, as described above, such a provision is invalid.

■ Private carriers may be subjected to regulation appropriate to their status.

■ There is no Supreme Court decision holding that private

carriers may not appropriately be certified. The dissenting opinion in the Frost case insists that they may; the majority opinion points in the same direction."

HINES, J. I concur in the result reached in this case. The Saye & Davis Transfer Company was expressly chartered for the purpose of carrying on a public business, consisting of transporting freight and passengers over the public highways of this State. This company was not chartered to do the business of a private carrier. Having been incorporated as a public carrier, this company is subject to the jurisdiction of the Public-Service Commission of Georgia for all the purposes expressed in the motor-carrier act of 1929. With the light before me, and without expressing any opinion upon the question, I do not pass upon the question whether the State can regulate the rates of private carriers. I leave this question open for future consideration, when it arises in a proper case. I am clearly of the opinion, however, that the legislature can regulate both classes of carriers in the use of the public highways of this State. Whether the power extends to the regulation of the rates of private carriers, the routes they shall occupy, and other terms on which they can do business, I leave open.