## STEPHENSON v. BINFORD et al.
### No. 479.

District Court, S. D. Texas, Houston Division. Oct. 26, 1931.

510

KENNERLY, District Judge, dissenting in part.

Fulbright, Crooker & Freeman and Franklin & Blankenbecker, all of Houston, Tex., for plaintiff.

James V. Allred, Atty. Gen., and Elbert Hooper and T. S. Christopher, Asst. Attys. Gen., W. L. Cook and Andrews, Streetman, Logue & Mobley, all of Houston, Tex., and Albert Reed, of Dallas, Tex., for respondents.

Before HUTCHESON, Circuit Judge, and WEST and KENNERLY, District Judges.

HUTCHESON, Circuit Judge.

Faced with the grave necessity of adequately regulating motor traffic on the highways of Texas in the interest at once of the safety of the traveling public, the protection of the highways, and the maintenance of a safe and dependable transportation system, both by rail and by road for the people of the state, the Forty-Second Legislature of Texas at its regular session enacted into law a legislative program designed and comprehensive enough to deal with and to remedy the mischiefs incident to unregulated use of the highways, including those arising from the

unprecedented use of the highways by private contract carriers for hire.

As a part of this program it enacted into law chapter 277, House Bill 335 (Vernon's Ann. Civ. St. Tex. art. 911b). This bill, basing upon the declaration of legislative policy that "the business of operating as a motor carrier of property for hire along the highways of this State is declared to be a business affected with the public interest" (section 22b [Vernon's Ann. Civ. St. Tex. art. 911b, § 22b]),[1] specifically defined and undertook as to each to regulate the business on the highway of common and contract carriers for hire. It in effect declared the right to operate motor carriers over the highways to be a public franchise, and that no one should engage in that business except in pursuance of a franchise from the state so to do. It fixed the conditions of the franchise to be enjoyed by common carrier and by contract carrier respectively. The evidence of the franchise to be a common carrier was designated a certificate of convenience and necessity; of the franchise to be a contract carrier, a permit.

To the Railroad Commission of Texas, as the body charged under the laws of the state with general supervision over, and as the administrative agent of the state in matters affecting its traffic and transportation laws, it confided, in co-operation with the highway commission, the administration of the act. Before its effective date plaintiff, alleging himself to be a private contract carrier engaged presently and at the time of the enactment of the law in question in hauling freight over the highways of Texas exclusively under a single contract with the Southwest Freight Company, a freight forwarder, and that the act, in violation of the Fourteenth Amendment, denied him due process and the equal protection of the laws, brought this

[1] Sec. 22b: Declaration of Policy. The business of operating as a motor carrier of property for hire along the highways of this State is declared to be a business affected with the public interest. The rapid increase of motor carrier traffic, and the fact that under existing law many motor trucks are not effectively regulated, have increased the dangers and hazards on public highways and make it imperative that more stringent regulation should be employed, to the end that the highways may be rendered safer for the use of the general public; that the wear of such highways may be reduced; that discrimination in rates charged may be eliminated; that congestion of traffic on the highways may be minimized; that the use of the highways for the transportation of property for hire may be restricted to the extent required by the necessity of the general public, and that the various transportation agencies of the State may be adjusted and correlated so that public highways may serve the best interest of the general public.

suit to enjoin its enforcement. W. S. Finnegan, P. E. Arnett, and D. A. Beard intervened. All claimed to be similarly situated with the plaintiff; Finnegan as a hauler exclusively for the West Texas Motor Freight Lines; Arnett for the Linde Air Products Line; and Beard for the Peden Iron & Steel Company exclusively and under private contract; and they ask the same relief. Finnegan alone claims to be a hauler in interstate commerce. His allegation in that respect is that, though he hauls between points entirely within the state of Texas, the goods which he hauls have moved into Texas interstate, and that he hauls them as part of their uncompleted movement.

While the prayer is for relief against the act in its entirety, the protest against those features of the bill which are directed to securing traffic safety and highway protection is very mild. Indeed, the validity of these provisions is in effect conceded. Summarized, these require the use on trucks of only competent drivers holding licenses; fix the off and on hours of the drivers; require the carriers to secure the public against loss from personal injuries; authorize the inspection and approval or disapproval by the commission of the equipment to be used by the carriers; the manner of loading, the size and character of the packages, and the weight of loads; authorize the commission to classify the highways as to congestion upon them and as to their character and ability to withstand varying transportation uses, and generally confer upon the commission complete supervision over the highways in the interest of their protection from abuse, and of the public safety.

To defray the expense of administering the act, and as a license or franchise fee, it exacts of the contract carrier a permit fee of $10 of the common carrier a certificate fee of $25 and of both common and contract carriers a license fee of $10.

The power of the state to regulate and control the movements of motor vehicles over its highways in the interest of public convenience and safety, and for the protection of the highways, for the proper use of which it is the trustee to the public, is of the widest scope, and provisions of this kind have been uniformly sustained. Buck v. Kuykendall, 267 U. S. 314, 45 S. Ct. 324, 69 L. Ed. 623, 38 A. L. R. 286; Packard v. Banton, 264 U. S. 140, 44 S. Ct. 257, 68 L. Ed. 596; Johnson v. Perry (D. C.) 47 F.(2d) 900, and three cases decided by this court McLeaish v. Binford, 52 F.(2d) 151, 52 F.(2d) 737, two

cases, and Sproles v. Binford, 52 F.(2d) 730.

We find no difficulty then in sustaining against the attack of the suit, and denying the prayer for injunction as to all of the provisions above referred to, since each of them has direct relation to highway control and regulation; in fact, speaks the very language of such power.

The real attack of plaintiff and interveners is pressed against those provisions of the act which, based upon considerations of the public interest in the establishment and maintenance of a dependable transportation system for the state, authorize the commission to grant or refuse permits to contract carriers upon consideration, not only of questions of congestion upon the highways, the fitness and capacity of the contract applicant to conduct the business which he offers to do, but of conditions prevailing along the route proposed as to already existing adequate service by common carriers.

Especially is the attack pressed against the right accorded by the act to the commission to grant or refuse the permit upon consideration of the whole transportation and traffic structure of the state, and upon a determination of whether the stability and integrity of that structure will be bettered or injured by the grant. They take as their shibboleths the pronouncements of the Supreme Court in Michigan v. Duke, 266 U. S. 571, 45 S. Ct. 191, 69 L. Ed. 445, 36 A. L. R. 1105; Buck v. Kuykendall, 267 U. S. 314; Frost v. Commission, 271 U. S. 583, 46 S. Ct. 605, 70 L. Ed. 1101, 47 A. L. R. 457; and Smith v. Cahoon, 283 U. S. 553, 51 S. Ct. 582, 75 L. Ed. 1264, that a Legislature may not by its fiat convert a contract carrier into a common carrier, and that, while the state may regulate the highways, it may not regulate private business done upon them.

They say that the terms of the act authorizing the refusal of a permit, if "the Commission shall be of the opinion that the proposed operation of any such contract will impair the efficient public service of any authorized common carrier then adequately serving the same territory," authorizing it to fix minimum rates to be charged by contract carriers in no event less than those charged by common carriers, forbidding rebates and discrimination, and the making of contract charges less than those fixed by the commission, requiring contract as well as common carriers to keep books of account and make reports to the commission, and contract as well as common carriers to make bonds for

the protection of shippers, are in the very teeth of these pronouncements.

The state replies that the great issues of public policy and sovereign power with which this bill deals may not be so naively disposed of with a phrase; that the act in question here avoids the rock and whirlpool of the Frost Case, the charge of uncertainty and indefiniteness of the Cahoon Case; that by its declaration of policy and the clear distinction made and preserved in the act between common and contract carriers it has escaped altogether the confusion and uncertainty in point of view which has manifested itself in the decisions of so many of the state courts and commissions in their efforts to sustain state action in the face of the confident invocation of the phrase, the Legislature may not by fiat convert a private into a common carrier, first used broadly in the Duke and Buck Cases of interstate carriers, and later in the Frost and Cahoon Cases given limited application to the intrastate carriers there involved.[2]

The state insists here that the oversimplification of highway problems for the irresponsible and unregulated private carrier, which those who invoke this magic phrase assert must come about under its aegis, may not in fact be accomplished; that the phrase has, by its overemphasis upon the limitations on state power given to the purely permissive status of a private carrier for hire, the false appearance of a status as of right at the expense of the power of sovereign states to govern men and things; that at last the effective solution of intrastate highway problems may be correctly approached only from the standpoint of the undoubted power possessed by a sovereign state to withhold entirely from carriers for hire the privilege of using its roadways as a place of business (Packard v. Banton, 264 U. S. 140, 44 S. Ct. 257, 68 L. Ed. 596; Frost v. Comm., 271 U. S. 583, 46 S. Ct. 605, 70 L. Ed. 1101, 47 A. L. R. 457), or to grant a franchise to use them (Frost v. Okla. Comm.,

---

[2] Frost v. R. R. Com. of Calif., 197 Cal. 230, 240 P. 26; Cahoon v. Smith, 99 Fla. 1174, 128 So. 632; Rutledge v. Baughman, 153 Md. 297, 138 A. 29, 56 A. L. R. 1042; Barbour v. Walker, 126 Okl. 227, 259 P. 552, 56 A. L. R. 1049; Davis v. Metcalf, 131 Wash. 141, 229 P. 2. The same confusion exists where the statutes are denied application. Hissem v. Guran, 112 Ohio St. 59, 146 N. E. 808; Haddad v. State, 23 Ariz. 105, 201 P. 847; State v. Nelson, 65 Utah, 457, 238 P. 237, 42 A. L. R. 849; while in Georgia the matter has come to a deadlock, Ga. Pub. Service Com. v. Saye, 170 Ga. 873, 154 S. E. 439 sustains the right to regulate private carriers, while McIntyre v. Harrison, 172 Ga. 65, 157 S. E. 499, by divided court resulting from the failure of the Chief Justice to vote, it was held that private carriers could not be so regulated.

278 U. S. 515, 49 S. Ct. 235, 73 L. Ed. 483), affixing to the grant in the public interest such conditions as are deemed by the state to be for the public good, including the reasonable regulation of their rates and practices (Tagg Bros. v. U. S., 280 U. S. 420, 50 S. Ct. 220, 74 L. Ed. 524; Sutter Butte Canal Co. v. R. R. Com., 279 U. S. 125, 49 S. Ct. 325, 73 L. Ed. 637; Cotting v. Kansas City Stock Yards Co., 183 U. S. 85-91, 22 S. Ct. 30, 46 L. Ed. 92).

It declares:

That the state of Texas has from such viewpoint approached the solution of the great and pressing problems growing out of a highway system including state and county roads, of nearly two hundred thousand miles on which state and county expenditures have been more than a half billion dollars.

That by a complete and comprehensive act it has undertaken neither to convert private carriers into common carriers, nor, upon the pretext of regulating highways, to impose arbitrary restrictions upon the business of those who use them. That what it has done has been to put into effect the legislative policy above referred to, that the business of carrying for hire on the public roads is a business affected with a public interest, which may be enjoyed only under legislative grant. That it has fixed the conditions of such grant, and that any person desiring to conduct his business over the public roadways may under the statute, freely electing the character of business he will engage in, apply for, and by complying with the conditions fixed obtain, a franchise as a common or as a contract carrier, according to his desire.

That this system of regulation designed in the interest of the public convenience will operate to bring highway order out of highway chaos by preventing a further disintegration of the all but practically destroyed common carrier service on the roads. That the exercise of the powers which the act, confers will not only protect the roadways and the people on them from the results of reckless and careless operation, but will give to the whole people of the state a safe and dependable system of transportation for the carriage of their freight by highway.

Whether the policy which the state of Texas is now entering upon of bringing under regulation as to rates and practices all of its facilities which engage in the business of the carriage of goods for hire is economically wise and sound, whether it will produce the results claimed for it, or will, as plaintiffs contend, result in ultimate injury to the public, by depriving the public of the services of private business carriers, and of that competition which they in their unrestricted state afford, are not matters with which we may concern ourselves.

The question before us, the state having acted, is merely one of state power. If the state had the power to set these experiments on foot, its action may not be interfered with. Upon that question we think the state has the right of it. A short statement of our reasons for this conclusion may serve to bring into sharper relief at once the problem which the case presented to us, and the method employed by us in its solution.

Of all the problems pressing upon the state, none present more comprehensive, more far-reaching, more troublesome aspects than do those arising from the effect upon the established common carrier transportation services by rail and road, of the rapidly increasing use of the highways for the carriage of freight for hire by persons assuming the real or pretended status of private contract carriers, and asserting their business to be unregulable. These problems have been attacked in most, if not all, of the states by statutes which, differing in unsubstantial particulars, have been influenced by and have presented the same general theory, given full and definite expression by the Supreme Court of California in Frost v. Railroad Commission of State of California, 197 Cal. 230, 240 P. 26, that, since states may exclude carriers for hire whether common or contract altogether from the public roads, it may affix conditions upon their use of them.

These statutes early encountering in the Duke and Buck Cases as to interstate commerce, and in the Frost Case as to intrastate commerce, the declaration of the Supreme Court that private carriers may not by legislative fiat be converted into common carriers, have had checkered careers in the courts of the several states.[3] Most of the courts have felt constrained by the Frost decision to deny to the state the right to make existing regulations as to common carriers applicable to private carriers; many of them have avoided the difficulty by finding that the carriers involved were in fact not private, but common, carriers, while some of them

[3] Two excellent law review articles, "Regulation of the Contract Motor Carrier under the Constitution" Harvard Law Review, vol. XLIV, No. 4, p. 536, and "Motor Carrier Regulation, Federal, State and Municipal" Columbia Law Review vol. 26, p. 954 et seq., interestingly collect and discuss the authorities.

have sustained the statutes on the ground that they did not attempt to convert private carriers into common carriers, but in effect imposed specific legal regulations upon each class of carrier, to which each must conform. Rutledge v. Baughman, 153 Md. 297, 138 A. 29, 56 A. L. R. 1047; Barbour v. Walker, 126 Okl. 227, 259 P. 552, 56 A. L. R. 1049. The Supreme Court of Florida tried in Cahoon v. Smith, 99 Fla. 1174, 128 So. 632, to give effect to a statute of that state regulating private as well as common carriers, but found itself, as the Supreme Court of California had been in the Frost Case, hoist on the petard of its own efforts at construction. Smith v. Cahoon, 283 U. S. 553, 51 S. Ct. 582, 75 L. Ed. 1264. The Supreme Court of Georgia has gotten itself into the uncomfortable position of apparently facing both ways; the full court through the Chief Justice in Ga. Public Service Com. v. Saye, 170 Ga. 873, 154 S. E. 439, 440, sustaining the right to regulate private carriers; a divided court, the Chief Justice not sitting, in McIntyre v. Harrison, 172 Ga. 65, 157 S. E. 499, 508, later holding the contrary.

 Standing out in decisions, text-books, and law articles is the universally accepted doctrine that the use of public roads for the conduct of business thereon, whether by common or by private carriers, is an extraordinary use, and as such is enjoyed, not as a right, but as a privilege. That the state may altogether exclude hauling by carrier, common or contract intrastate, from its roads, is generally taken for granted. The difficulties of the states have arisen where, choosing a middle course between exclusion altogether and permitting unbridled use, they have sought to impose conditions upon private carriers the same as, or analogous to, those imposed upon common carriers, and here its difficulty has arisen, not out of efforts to regulate the manner of the use of the highways, but by controlling rates and practices to regulate the business done thereon. Michigan v. Duke, 266 U. S. 571, 45 S. Ct. 191, 69 L. Ed. 445, 36 A. L. R. 1105; Buck v. Kuykendall, 267 U. S. 314, 45 S. Ct. 324, 69 L. Ed. 623, 38 A. L. R. 286; Frost v. Commission, 271 U. S. 583, 46 S. Ct. 605, 70 L. Ed. 1101, 47 A. L. R. 457; Smith v. Cahoon, 283 U. S. 553, 51 S. Ct. 582, 75 L. Ed. 1264.

In view of these decisions, whatever difficulties one may have in agreeing with the majority opinion in the Frost Case, that the private carrier stands as to the state protected by the Federal Constitution against a conditioning of its use of the roads, in the same case as foreign corporations in the cases cited there stood with reference to the right of resort to the federal courts, directly granted to them by the Federal laws, and the writer is one who experiences that difficulty, it must be fully conceded that, if the case presented here is the same as that presented there, the power of the state must be denied, and the injunction prayed for granted.

We think it perfectly plain that the statute under construction here is wholly different, not only from the statutes discussed in the Frost and Cahoon Cases, but from any heretofore brought under review.

This statute approaches the matter of regulation from an entirely different angle; it exerts the power of the state in an entirely different way. It presents with crystal clearness the point whether the state must choose between the alternatives of excluding private carriers altogether from its roads or of permitting them to use the roads in the conduct of the kind of business which the state has declared must be conducted thereon.

Here is no case of compelling private carriers to become common carriers; no case of granting a right, and thereafter arbitrarily or illegally conditioning that right. Here is a case of a clear, a simple, a complete declaration of policy that the public has an interest in the business of carriage for hire over the highways of the state, a prohibition of the right to engage in such business except under a franchise, and an affixing to the enjoyment of a franchise the condition that the holder must become an integral part of the transportation system of the state, and must submit to the regulations applicable to his franchise as to rates and practices.

 We recognize, of course, that against the challenge of its validity a state statute cannot stand upon legislative declaration alone. Foster Pkg. Co. v. Haydel, 278 U. S. 1, 49 S. Ct. 1, 73 L. Ed. 147; Ribnik v. McBride, 277 U. S. 350, 48 S. Ct. 545, 72 L. Ed. 913, 56 A. L. R. 1327; Burns Baking Co. v. Bryan, 264 U. S. 504, 44 S. Ct. 412, 68 L. Ed. 813, 32 A. L. R. 661; Frost v. Okla. Comm., 278 U. S. 515, 49 S. Ct. 235, 73 L. Ed. 483; Tyson v. Banton, 273 U. S. 418, 47 S. Ct. 426, 71 L. Ed. 718, 58 A. L. R. 1236; Wolff Pkg. Co. v. Court of Industrial Relations, 262 U. S. 522, 43 S. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280; but those cases and many others clearly establish that in all the courts, and certainly in the courts of first instance, the legislative declaration of purpose and policy is entitled to gravest considera-

tion, and, unless clearly overthrown by facts of record, must prevail.

The record in this case teems with evidence supporting the state's declaration of purpose and policy that the use of the highways is affected with a public interest, and that the conduct of unregulated business over it is bringing about the prevalence of the mischiefs and evils which the legislation in question is designed to avoid.[4]

The affidavits of the railroad and highway commissioners, of holders of public convenience and necessity certificates, and the records of the two commissions, show an enormous increase of so-called private carriers for hire, with a shrinking and dwindling away of common carriers. It was testified to without dispute, and we find, that the inevitable result of the continuance of this condition will be the disappearance altogether of the common carrier from the roads, for, as matters now stand, all that he gets in exchange for the tender of his services to the public under his franchise is exposure to unrestricted, unlimited, irregular, and destructive competition from carriers private in name, but public in fact, who unregulated, ply their vocation along the roads, seeking business any and every where.[5]

Can it be justly said under these circumstances that a state which feels that it is in the public interest to establish and maintain a correlated system of transportation, safe and dependable, which all the public may rely upon and use, must not only stand powerless to do so, but must, through the extension of improved highways, furnish more and ever more facilities for the doing of business

thereon by unregulated private carriers until its public carriage system has disappeared? We do not think so.

We think that the cases which have discussed regulatory statutes and the status of a private carrier under them have discussed them too much from the standpoint of that status as fixed at common law, unaffected by statute, and that the overemphasis of his common-law status has operated erroneously to obscure the fact that he enjoys this status, not as a right, but as a privilege.

We think it perfectly plain that, as he never had a right on the roads, but merely a privilege as to them, it is too much to say that, when the state undertakes to impose upon him conditions different from those characterizing him at common law, his privilege flowers under the Fourteenth Amendment into a right which the state may not impair.

We think that, if a state determines that the business of common carriage by rail and road may no longer, from the standpoint of public interest, be looked upon as a business entirely separate and distinct from that of contract carriers by road, that all of its available carriage services are so bound together and so interdependent that the public may not continue to have a safe and dependable system of transportation unless private carriers operating on the same roads with common carriers are brought under just and reasonable regulations, bringing their services into relation with those of common carriers thereon, no just or valid reason exists why it may not do so.

■ We may in passing notice, but to reject it, the complaint that the act is invalid because subdivision d of section 6 (Vernon's Ann. Civ. St. Tex. art. 911b, § 6, subd. d) gives the commission authority to grant special terms to carriers of certain kinds of goods, thus working a discrimination. Of this complaint it is sufficient to say that it will be time enough to make it when rights have been infringed by action under the section. If plaintiff takes out a permit, and the commission thereafter, under authority of the section, attempts unlawfully to confer a permit upon another on less onerous terms, plaintiff may then apply for relief. Frost v. Corporation Commission of State of Oklahoma, 274 U. S. 719, 47 S. Ct. 589, 71 L. Ed. 1323. Besides, this section is in terms made separable from the rest of the act, and, if it is invalid, it, and not the act, will fall.

■■ In the same way we notice the argument of the intervener Beard that the act is

---

[4] A considerable part of the message of the Governor to the Forty Second Legislature had to do with highways and the business done over them. It called attention to the fact that "Our roads are being taken and badly used by motor vehicles engaged in the transportation of passengers and freight for hire. * * * When the saving this business brings the public in the cost of its transportation is compared with the damage which heavy freight and passenger traffic are doing the highways, it is doubtful whether the motor truck and motor bus business is being operated economically from the standpoint of the public."

It also called attention to the uneconomical conditions resulting from the unrestricted competition of unregulated motor trucks and the handling of freight over the highways. It said—"If trucks and busses are to operate in competition with railroads, and at considerable damage to highway development, and if, because of the reduced business of the railroads, the public is made to pay higher railroad rates on commodities moving by rail, it is hardly possible that under such conditions the truck and bus transportation could be economically profitable to the general public."

[5] Affidavits of F. W. Ruby, M. S. Day, L. C. Abbott, E. C. Sanders, C. E. Terrell, Chairman Railroad Commission, W. R. Ely, Chairman Highway Commission.

unreasonably restrictive because its effect is to prohibit the casual use of roads by individuals who, not in the general business of carriage for hire, but as mere agents for another, casually haul, making a charge therefor.

In our opinion, the act does not admit of such interpretation. We think it is directed at and reaches only those persons who, as complainant and interveners do, make their living off of carriage on the roads. Besides, none of those in this case are casual carriers; they are all in it as a business. In fact, there is more than a little question as to whether, though the particular work they are now doing may be under private contract, they are not really common carriers, since they in fact hold themselves out for all the work which they may get to do.[6] Certainly none of them is a casual carrier, or in a position to complain on behalf of such carrier of hardships which the law may have imposed upon him.

We do not any more agree with the intervener Finnegan that he is an interstate carrier. His contract is made in Texas; his carriage is in Texas. Whether the goods which he is carrying have really come to rest before he picks them up, or are in the course of continuous transit, the record does not show. But, if it did show the facts to be as he contends, we think it would be a straining of the point to say, because the goods he handles intrastate have come from outside of it, that the requirement that the carrier who contracts wholly in Texas, and who carries wholly there, procure a permit to do so, and submit himself to the regulations which the state requires, constitutes a burden on interstate commerce.

The case comes at last to the one great question, whether those engaged generally in the unregulated business of the carriage of goods for hire may, merely because they carry usually for single individuals and upon special terms, by invoking the Fourteenth Amendment, maintain the right to continue to do such business on the public roads, against the will of the state asserted by statute that they shall not do so.

We·think the question admits of only one answer, that the requirements of the Texas statute are valid, and that, if plaintiff and interveners wish to conduct their business on the highways of this state, they must comply with them.

So believing, we deny the temporary injunction prayed for.

WEST, District Judge, concurs.

KENNERLY, District Judge (dissenting).

In what is said respecting those regulations contained in the Legislative Act (House Bill 335), which concern traffic safety and highway protection, I fully concur. McLeaish v. Binford (D. C.) 52 F.(2d) 737; Sproles v. Binford (D. C.) 52 F.(2d) 730; and McLeaish v. Binford (D. C.) 52 F.(2d) 151, and cases there cited. ·

I cannot, however, see my way clear to concur in the disposition made of the questions raised and presented by complainant and interveners (who are I think clearly contract carriers or private carriers, and not common carriers) respecting those regulations in the act which in no real sense concern traffic safety and highway protection, but are in fact a regulation of the business, and a restriction of the right of contract, of the contract carriers. I think there is no material difference in legal effect between the Michigan, Washington, California, and Florida Acts and this act, and that Michigan v. Duke, 266 U. S. 571, 45 S. Ct. 191, 69 L. Ed. 445, 36 A. L. R. 1105; Buck v. Kuykendall, 267 U. S. 314, 45 S. Ct. 324, 69 L. Ed. 623, 38 A. L. R. 286; Frost v. Commission, 271 U. S. 583, 46 S. Ct. 605, 70 L. Ed. 1101, 47 A. L. R. 457; and Smith v. Cahoon, 283 U. S. 553, 51 S. Ct. 582, 75 L. Ed. 1264, are controlling. I think the temporary injunction prayed for, restraining the enforcement of the last-mentioned regulations, should be granted.

---

### In re DUNN.

District Court, E. D. New York.
Sept. 25, 1931.

---

[6] "Regulation of the Contract Motor Carrier under the Constitution," Harvard Law Review, vol. XLIV, No. 4, p. 536; "Motor Carrier Regulation, Federal, State and Municipal," Columbia Law Review, vol. 26, pp. 963, 964.